ACCEPTED
05-18-00617-CV
FIFTH COURT OF APPEALS
DALLAS, TEXAS
6/5/2018 1:17 PM
LISA MATZ
CLERK

NO. 05-18-00617-CV

IN THE
FIFTH COURT OF APPEALS
DALLAS, TEXAS

FILED IN
5th COURT OF APPEALS
DALLAS, TEXAS
6/5/2018 1:17:27 PM
LISA MATZ
Clerk

**MARK SMITH, MARK & TAMMY SMITH, LLC,
DARIN KIDD, AND TEE DANIEL,**
*Appellants*
v.
**NERIUM INTERNATIONAL, LLC,**
*Appellee*

ON APPEAL FROM THE
134TH JUDICIAL DISTRICT COURT,
DALLAS COUNTY, TEXAS

**APPELLANTS' MOTION FOR TEMPORARY EMERGENCY RELIEF**

To the Honorable Fifth Court of Appeals:

Appellants Mark Smith, Mark & Tammy Smith, LLC, Darin Kidd, and Tee Daniel, file their Motion for Temporary Emergency Relief pending resolution of this interlocutory appeal pursuant to TEX. R. APP. P. 29.3, and would respectfully show the Court the following:

## I.     Introduction.

In this interlocutory appeal, Appellants challenge a temporary injunction (CR 700; **Appendix A**) enjoining them from soliciting salespeople who work for Nerium International, LLC ("Nerium"), the company Appellants were previously associated

1

with. Because this is a significant restraint of trade that hinders Appellants' ability to earn a living and puts them at risk of inadvertent violation, Appellants request very narrow emergency temporary relief to preserve their rights pending resolution of this appeal. Specifically, Appellants request that this Court modify the temporary injunction: 1) to conform to the contract between the parties; and 2) to allow Appellants to be able to avoid inadvertent violations of the injunction. *See In re Tex. Nat. Res. Conserv. Comm'n*, 85 S.W.3d 201, 207 (Tex. 2002) ("In its discretion, the court of appeals may grant temporary orders" in connection with an interlocutory appeal challenging an injunction).

Temporary orders are necessary to preserve the rights of Appellants pending appeal and the compelling circumstances warranting such relief are discussed below. *See Oryon Techs., Inc. v. Marcus*, 429 S.W.3d 762 (Tex. App.—Dallas 2014, no pet.). Further, the narrow relief requested herein will not prejudice Nerium because: 1) the relief under issue 1 is based on the language of the contract between the parties—a contract that Nerium drafted; and 2) the relief under issue 2 will enable Appellants to comply with the temporary injunction without fear of inadvertent violations.

## II.  Background facts.

Nerium is a multi-level marketing company that sells beauty products with a network of "tens of thousands" of independent distributors referred to as "Brand Partners." (CR 53, 57). Brand Partners are independent contractors. (CR 53; CR 98 at

2

§ 1.11). Nerium's Brand Partners earn money by selling Nerium's products and by enrolling new Brand Partners to do the same. (Id.).

Nerium has developed "Policies and Procedures" ("P&P"), and requests that each Brand Partner accept and agree to them. (CR 96; **Appendix B**). The P&P contains the non-solicitation provision at issue. Under Section Three of the P&P, Brand Partners may personally "sponsor" other Brand Partners by introducing them to Nerium and recruiting them to become Brand Partners. (CR 101). All recruits who flow from these personally sponsored Brand Partners are called the Brand Partner's "downline." (Id.). Brand Partners receive commissions both on their own sales and on sales in their downline. (Id.).

Prior to joining Nerium, Mark Smith and his wife, Tammy Smith, worked with another direct-sales company, Prepaid Legal Services, Inc. ("Prepaid"). (CR 58). While at Prepaid, the Smiths, without assistance from Nerium, built a large network of downline distributors. (CR 230). When the Smiths departed Prepaid to associate with Nerium,[1] they brought key people from the network of their downline distributors with them. (CR 231).

Nerium asserts that in mid-2017, it implemented a system where Brand Partners were required to agree to the amended P&P, including the non-solicitation provision, in order to access their "back office," a virtual office where Brand Partners

---

[1] The Smiths assert they were never Brand Partners, but can be considered Brand Partners for purposes of this motion.

AUS-6558790-1

could log on and manage their sales. (CR 60). The portion of the P&Ps on which Nerium relies is as follows:

> **11.06 Non-Solicitation and Non-Competition.** Brand Partner acknowledges and agrees that the only way to protect the good will, confidential, proprietary and trade secret information of Company and the integrity and stability of the sales force created by other Brand Partners is to prohibit all Brand Partners from recruiting and soliciting of other Brand Partners to other companies during the term of this agreement and for a reasonable time thereafter. Consequently, in consideration for all of the rights granted by this Agreement, including the protection this non-solicitation provision affords to Brand Partner, for **the term of this Agreement and for two (2) years after termination hereof, for any reason, Brand Partner agrees not to, directly or indirectly, recruit or solicit any of Company's other Brand Partners to join other direct sales, multi-level or network marketing companies**.

(CR 116; emphasis added).

Appellants ended their association with Nerium in March 2018, and have joined Jeunesse Global Holdings, LLC ("Jeunesse"), which is a multi-level marketing program similar to Nerium. Nerium brought this suit to enjoin Appellants from soliciting any Nerium Brand Partners to leave Nerium and join Jeunesse (or any other marketing program). (CR 12). The trial court granted a temporary restraining order and then a temporary injunction, prohibiting Appellants as follows:

> The Injunction Restrained Parties [Appellants] are prohibited from directly or indirectly recruiting or soliciting any of Nerium's Brand Partners to join any other direct sales, multi-level marketing, or network-marketing company, including but not limited to Jeunesse Global Holdings, LLC.

AUS-6558790-1

(CR 700; **Appendix A**). On its face, this injunction prohibits Appellants from soliciting *any* of Nerium's Brand Partners, including those Brand Partners whom Appellants personally brought into Nerium, such as the extensive downline that the Smiths brought with them to Nerium when they left Prepaid.

As discussed below, this prohibition is contrary to another provision of the P&P that specifically authorizes Appellants to promote competing marketing programs, such as Jeunesse, to Brand Partners who were personally sponsored by Appellants. (CR 99). These two contractual provisions must be construed together to allow an exception to the enjoined conduct. Appellants seek temporary emergency relief modifying the injunction allow Appellants to promote other marketing programs, including but not limited to Jeunesse, to those Nerium Brand Partners whom Appellants personally sponsored while at Nerium, as expressly allowed under the P&P.

In addition, Appellants must be provided sufficient information to be able to comply with the temporary injunction. They are currently enjoined from "recruiting or soliciting any of Nerium's Brand Partners," but they cannot possibly know the universe of who is or is not a Nerium Brand Partner. As Nerium asserts in its petition, Nerium has at least tens of thousands of Brand Partners world-wide. (CR 53, 57). Appellants are therefore at significant risk of inadvertently violating the injunction by contacting someone they do not know to be a Brand Partner at Nerium. Accordingly, Appellants request temporary emergency relief limiting the injunction to recruiting or

5

soliting efforts specifically aimed at persons they *know* to be Nerium Brand Partners.[2]

### III. The Temporary Injunction prohibits conduct that the contract expressly allows.

The temporary injunction enjoins Appellants from "directly or indirectly recruiting or soliciting any of Nerium's Brand Partners to join any other direct sales, multi-level marketing, or network-marketing company." There is no exception for Nerium Brand Partners who were personally sponsored by Appellants to join Nerium. This would even include any of Appellants' family members or close friends they personally brought to Nerium—people who never would have joined Nerium if not for the efforts of Appellants.

While the injunction tracks the language of the non-solicitation clause in the P&P, that language cannot be read in isolation. Rather, it must be interpreted and applied in the context of the contract as a whole. *See Guy L. M. Floyd, F.P.C.S., Inc. v. Vipond*, No. 04-05-00559-CV, 2006 WL 1686537, *2 (Tex. App.—San Antonio June 21, 2006, no pet.) (mem. op.) (applying general rules of contract construction to covenants not to compete); *Tummala v. Total Inpatient Serv., P.A.*, No. 01-14-00458-CV, 2015 WL 5156903, *2 (Tex. App.—Houston [1st Dist.] August 27, 2015, no pet.) (mem. op.) (same). Accordingly, this Court must:

---

[2] Alternatively, Appellants are entitled to have a list of current Nerium Brand Partners so they can know whom not to solicit, although Nerium has refused to produce such a list.

AUS-6558790-1

- "ascertain and give effect to the true intentions of the parties as expressed in the writing itself."

- "examine and consider the entire writing in an effort to harmonize and give effect to all the provisions;"

- construe the entire contract so that no provision "will be rendered meaningless;"

- "avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive."

*Tummala*, 2015 WL 5156903 at *2 (citing *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011); other citations omitted). Nerium wishes to focus solely on the non-solicitation clause, but "[n]o single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." *Seagull Energy E&P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006).

Section 1.16 of the P&P states that both during and after a Brand Partner's association with Nerium, the Brand Partner is *allowed* to promote competing products, services, or marketing programs (such as Jeunesse's products or marketing programs) *to anyone whom the Brand Partner personally sponsored*:

> 1.16 Other Products. A Brand Partner agrees that no products except the Company's products shall be sold or shown at any event where the Company's products are sold or shown. During the term of the Brand Partner Agreement, and for a period of six months thereafter, Brand Partner is **prohibited from** selling or **promoting** any competing products or services or **marketing programs** to any of the Company's Employees, Agents, or Brand Partners **except those Brand Partners personally sponsored by Brand Partner**.

AUS-6558790-1

(CR 99; **Appendix B** at § 1.16; emphasis added). This provision expressly authorizes a departing Brand Partner to promote another company's products or marketing programs to any Brand Partner personally sponsored by that Brand Partner. Appellants are therefore contractually authorized to promote a competing marketing program, such as Jeunesse, to Brand Partners that Appellants personally sponsored while at Nerium.

These two provisions—§ 1.16 and the non-solicitation clause—can and must be construed together and harmonized, if possible. *Italian Cowboy*, 341 S.W.3d at 333. Harmonization is possible by simply recognizing that the authorization to promote competing marketing programs *to personally-sponsored Brand Partners* is an exception to the non-solicitation clause. This makes sense given the P&P's recognition of the significant effort involved in personally sponsoring another Brand Partner. For example, the P&P requires sponsors to:

- "assure the adequate training of Brand Partners they sponsor;"

- "maintain an ongoing professional leadership association with Brand Partners;"

- "fulfill the obligation of performing a bona fide supervisory, distribution and selling function" regarding the Brand Partners they sponsor; and

- "provide [Nerium] with evidence of ongoing fulfillment of Sponsor responsibilities, including training."

(CR 101; **Appendix B** at § 3.03). It is the Brand Partner, not Nerium, who puts forth the effort to personally sponsor another Brand Partner by recruiting, training, and

8

supervising them. Appellants, not Nerium, have a vested interest and a personal relationship with the Brand Partners they personally sponsored.

Harmonizing these two provisions in this manner also renders the non-solicitation less unreasonable than it otherwise would be.[3] The ultimate test for a restraint of trade is the reasonableness of the covenant. *Marsh USA, Inc. v. Cook*, 354 S.W.3d 764, 774 (Tex. 2011). Reasonableness must be examined in light of the strong policies in Texas—a right-to-work state—that "a person's right to use his own labor in any lawful employment is … one of the first and highest of civil rights." *Marsh*, 364 S.W.3d at 776 (quoting *Int'l Printing Pressmen & Assistants' Union of N. Am. v. Smith*, 198 S.W.2d 729, 740 (Tex. 1947)). Unreasonable limitations on a person's right to change employers or solicit former co-employees "could hinder legitimate competition between businesses and the mobility of skilled employees." *Marsh*, 354 S.W.3d at 769. Ignoring § 1.16 and construing the non-solicitation clause so broadly as to prevent Appellants from promoting their new work-place to even those Brand Partners whom Appellants personally sponsored is inherently unreasonable.

Alternatively, if the conflict between these two provisions—one that expressly authorizes certain conduct, and another that purports to prohibit it—renders the non-solicitation clause ambiguous, any ambiguity must be resolved against Nerium, the drafter of the P&P. *Gonzalez v. Mission Am. Ins. Co.*, 795 S.W.2d 734, 737 (Tex. 1990)

---

[3] On the merits of this appeal, Appellants will demonstrate other ways in which the non-solicitation clause is unreasonable and unenforceable.

AUS-6558790-1

(an ambiguous contract is construed against the drafter). While Appellants may be enjoined from soliciting Brand Partners in general, they cannot be enjoined from promoting Jeunesse or any other competing marketing program to those Nerium Brand Partners Appellants personally sponsored.

**IV.    Appellants must be able to avoid inadvertent violations of the temporary injunction.**

As noted above, Nerium has tens of thousands of Brand Partners worldwide. The record will demonstrate that Appellants have no way of knowing who is or is not a Nerium Brand Partner. At their new company, Appellants need to grow their network of downline distributors to succeed, and recruiting new salespeople is a critical part of their business, as it was while they were at Nerium.

Appellants are currently enjoined from soliciting or recruiting any Nerium Brand Partner, but Appellants may not know that a particular person is a Brand Partner until after making first contact with that person. Appellants previously asked Nerium, in discovery, to provide a list of current Brand Partners, but Nerium refused to produce such a list. In order to prevent inadvertent violations of the temporary injunction, it should be modified to apply only to recruiting or soliciting efforts aimed at persons Appellants know to be Nerium Brand Partners. "An injunction must be definite, clear, and concise, leaving the person enjoined no doubt about his duties, and should not be such as would call on him for interpretations, inferences or

10

conclusions." *Vaughn v. Drennon*, 202 S.W.3d 308, 316 (Tex. App.—Tyler 2006, pet. denied).

## V. Temporary emergency relief requested.

For the reasons set forth above, Appellants request that this Court enter a temporary order modifying the temporary injunction as follows[4]:

> The Injunction Restrained Parties are prohibited from directly or indirectly recruiting or soliciting any ~~of~~ **persons who they know to be** Nerium's Brand Partners to join any other direct sales, multi-level marketing, or network-marketing company, including but not limited to Jeunesse Global Holdings, LLC.**; provided, however, the Injunction Restrained Parties may sell or promote any competing products or services or marketing programs to those Brand Partners personally sponsored by them.**

Appellants request such other relief to which they may be entitled.

Respectfully submitted,

*/s/ Elizabeth Bloch*
ELIZABETH G. BLOCH
State Bar No. 02495500
Heidi.bloch@huschblackwell.com
**HUSCH BLACKWELL LLP**
111 Congress, Suite 1400
Austin, Texas 78701
(512) 472-5456
(512) 479-1101 (fax)

RICHARD A. ILLMER
State Bar No. 10388350
Rick.Illmer@HuschBlackwell.com
**HUSCH BLACKWELL LLP**
2001 Ross Avenue, Suite 2000

---

[4] Appellants, of course, reserve the right to assert other challenges to the temporary injunction on the merits of this appeal.

AUS-6558790-1

**HUSCH BLACKWELL LLP**
2001 Ross Avenue, Suite 2000
Dallas, Texas 75201
(214) 999-6100 (Telephone)
(214) 999-6170 (Facsimile)

*Attorneys for Appellants*

## VERIFICATION

STATE OF      &sect;

         &sect;

COUNTY OF     &sect;

BEFORE ME, the undersigned authority, on this day personally appeared Mark O. Smith, and stated on his oath that he has reviewed the foregoing Appellants' Temporary Motion for Emergency Relief, that all of the factual information stated in the foregoing motion is within his personal knowledge and is true and correct.

Mark O. Smith

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

SUBSCRIBED AND SWORN to before me this ___ day of June, 2018.

State of California
County of Orange

Notary Public in and for the
State of

Subscribed and sworn to (or affirmed) before me on this 4th day of June, 2018 by Mark O. Smith

proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

My Commission

Expires:

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this notice was served on the following counsel via the court's e-filing system on June 4, 2018.

Monica Latin
Neil Burger
Parker Graham
Brent Rubin
CARRINGTON, COLEMAN, SLOMAN & BLUMENTHAL, L.L.P.
901 Main Street, Suite 5500
Dallas, Texas 75202
Fax: (214) 855-1333
*Counsel for Appellee.*



MAYUR MODY
COMM...2103673
NOTARY PUBLIC-CALIFORNIA
ORANGE COUNTY
My Term Exp. April 15, 2019

## CERTIFICATE OF CONFERENCE

The undersigned certifies that she conferred with counsel for Appellees via email and Appellees are opposed to the relief requested herein.

/s/ *Elizabeth Bloch*
ELIZABETH G. BLOCH

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this motion was served on the following counsel via the court's e-filing system and via email on June 5, 2018.

Monica Latin
Neil Burger
Parker Graham
Brent Rubin
CARRINGTON, COLEMAN, SLOMAN & BLUMENTHAL, L.L.P.
901 Main Street, Suite 5500
Dallas, Texas 75202
Fax: (214) 855-1333
*Counsel for Appellee.*

/s/ *Elizabeth Bloch*
ELIZABETH G. BLOCH

AUS-6558790-1

| | | |
|---|---|---|
| NERIUM INTERNATIONAL, LLC, | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| MARK SMITH, MARK & TAMMY | § | |
| SMITH, LLC, DAVID BYRD, JENNI | § | DALLAS COUNTY, TEXAS |
| BYRD GRIER, CLAUDIA RANSOM, | § | |
| JASON RANSOM, DARIN KIDD, | § | |
| DANNY GASEMY, LORI GASEMY, | § | |
| DALE MUNGER, VANESSA | § | |
| MUNGER, CASSIE DANIEL, and TEE | § | |
| DANIEL | § | |
| | § | |
| Defendants. | § | 134th JUDICIAL DISTRICT |

## TEMPORARY INJUNCTION

On May 21, 2018, the Court held a hearing on Plaintiff Nerium International, LLC's ("Nerium") Application for Temporary Restraining Order ("Application") against Defendants Mark Smith, Mark & Tammy Smith, LLC, Tee Daniel, and Darin Kidd (collectively the "Injunction Defendants"). The parties appeared and announced ready. Having considered Nerium's Second Amended Petition and Application for Temporary Restraining Order, the other pleadings and briefing on file, the competent evidence, and arguments of all parties, the Court finds the Application should be, and it is hereby, **GRANTED**. The Court sets forth the reasons for issuance of this Injunction:

1.	In its Second Amended Petition, Nerium has pleaded causes of action for breach of contract and tortious interference with contract against the Injunction Defendants.

2.	Nerium has shown a probable right to the relief sought, and presented evidence that tends to support that: (i) there is a valid contract between Nerium and the Injunction Defendants; (ii) Nerium performed or tendered performance under the contract; (iii) the

**APPENDIX A**

Injunction Defendants breached the contract by violating their non-solicitation covenants by directly or indirectly recruiting or soliciting Nerium's Brand Partners; and (iv) Nerium has suffered resulting harm, and will suffer harm absent the Injunction. In addition, Nerium has shown a probable right to the relief sought, and presented evidence that tends to support that: (i) a contract subject to interference exists; (ii) the alleged act of interference was willful and intentional; (iii) the willful and intentional act proximately caused damage; and (iv) actual damage or loss occurred. The Injunction Defendants have been involved in facilitating recruitment of Brand Partners by other Brand Partners, in violation of the same restrictions at issue here.

3. Without this injunction, Nerium will suffer a probable, imminent, and irreparable injury in the interim before a final trial on the merits. The non-solicitation covenants protect Nerium's goodwill, confidential information, and other valuable business interests, including by protecting the company's relationship with its salesforce of independent contractors ("Brand Partners") and customers, and information about them. Because Nerium is a direct-sales company, interference with Nerium's relationship with even a single Brand Partner can have damaging effects that extend to a Brand Partner's network of associated Brand Partners and customers, and imminently threaten far-reaching injury that is difficult to discover and fully assess. Once a Brand Partner is directly or indirectly solicited or recruited, their organization can become destabilized, risking the departure of others as well through further recruitment or otherwise.

4. The evidence demonstrated, among other things, the following: the Injunction Defendants have actively targeted not just individual Brand Partners, but also entire "Teams" of Brand Partners. They have done so through a variety of means, including direct contact with

**APPENDIX A**

Brand Partners; posting social media messages; hosting "zoom" calls and sending blast emails that may cause a Brand Partner to inquire about where they have gone or what they are doing or to ask for more information, followed by direct recruitment and solicitation; arranging for Brand Partners to fly to visit Jeunesse headquarters (at no expense) for promotional presentations about joining the company, with featured speakers including the Injunction Defendants; arranging payments to Brand Partners who leave Nerium to join Jeunesse and who recruit other Brand Partners to do the same; and urging Brand Partners to enroll with Jeunesse, while offering special promotions and insisting that time is of the essence.

5.      While at Nerium, the Injunction Defendants had an unlimited sales territory, and could sell products and recruit Brand Partners anywhere Nerium did business (currently the U.S. and ten foreign markets), often without leaving their homes in the United States. The Injunction Defendants, like many Brand Partners, have active profiles on social media and Nerium has demonstrated that recruitment and solicitation of Brand Partners often occurs through online and text communications, extending anywhere Nerium does business. In addition, the Injunction Defendants were widely known within Nerium's salesforce, and absent an injunction can exploit that experience and exposure to recruit and solicit Brand Partners whether previously known or unknown and whether or not they had previously worked together or even were known by them. Because Brand Partners are free to and do have wide-ranging contacts and activities in the countries where Nerium does business with no limitations, and considering the dynamic and wide-reaching nature of digital sales and social-media-based marketing, there is no practical way to protect Nerium's legitimate interests short of the restriction set forth in the agreement. The potential resulting harm would be difficult, if not impossible, to discover and to fully quantify

**APPENDIX A**

with monetary damages. For all these reasons, Nerium will likely suffer immediate and irreparable injury absent this Injunction.

6. Given Nerium's protectable interest set forth above, and the scope of the Injunction Defendants' actual and potential breaches, the Court finds that the requested injunction is reasonable and warranted. The harm to Nerium outweighs any potential harm to the Injunction Defendants because they are free to work in the direct-sales industry, free to solicit or recruit anyone who is not a Nerium Brand Partner, and free to pursue any other endeavors they wish. As such, restraining the Injunction Defendants from recruiting or soliciting Nerium Brand Partners does not impair their chances to fairly build their business at their new company or to make a living.

7. Therefore, to preserve the status quo, it is **ORDERED** that the Injunction Defendants, including their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of this Injunction by personal service or otherwise (collectively, the "Injunction Restrained Parties") are immediately restrained on the following terms:

> **The Injunction Restrained Parties are prohibited from directly or indirectly recruiting or soliciting any of Nerium's Brand Partners to join any other direct-sales, multi-level marketing, or network-marketing company, including but not limited to Jeunesse Global Holdings, LLC.**

8. This Injunction remains in effect until the conclusion of the final trial or final arbitration hearing on the merits. Without waiver of or prejudice to any party's arbitration rights, this case is set for a final trial on the merits with respect to the ultimate relief sought, as an initial matter, on *November 8th, 2018 @9:00 AM.* In its Second Amended Petition, Nerium pleaded the existence of an arbitration agreement between it and certain Defendants and attached the agreement to its pleading. Pls.' Second Am. Pet. at p. 25 & 65. The arbitration

**APPENDIX A**

agreement includes a carve-out that permits Nerium to apply for and obtain "a temporary injunction, preliminary injunction and/or other injunctive or emergency relief" in court "to safeguard and protect the Company's interests prior to the filing or during or following any arbitration" proceeding. *Id.* at 65. Accordingly, the Court's trial setting is without prejudice to any party's rights or obligations under the arbitration agreement, including any stay of this proceeding in favor of arbitration that may ultimately supersede the trial setting in this case.

9. The Court finds that ~~in addition to~~ the $5,000 bond previously posted as security for the ~~that~~ Nerium shall post an additional $25,000.00 to satisfy temporary restraining order ~~is sufficient and is authorized to and shall continue on and act~~ as security for the temporary injunction.

It is so **ORDERED**.

SIGNED on May *21*, 2018 at *7:30* ~~a.m.~~/p.m.

The Honorable Dale Tillery
Judge Presiding



# United States Policies and Procedures Manual

As a Brand Partner of Nerium International™, LLC (hereafter the "Company"), you are required to understand and comply with all rules, regulations, policies and procedures contained in this Brand Partner Policies & Procedures Manual (the "Policy Manual") that may be published or disseminated by the Company. The Company reserves the right to amend this Policy Manual by publishing or transmitting amendments as it deems appropriate.

The Company honors all federal, state and local regulations governing network marketing and requires every Brand Partner to do the same. It is, therefore, very important that you read and understand the information contained in this Policy Manual. If you have any questions regarding any rule or policy, seek an answer from your Sponsor, upline leader or the Company Department of Ethics and Compliance. The Code of Professional Ethics is included in Section 12 of this Policy Manual; you should review these materials and make them a part of your planning.

## CONTENTS

| | | |
|---|---|---|
| SECTION ONE: | BRAND PARTNER STATUS | 2 |
| SECTION TWO: | TERM AND RENEWAL | 5 |
| SECTION THREE: | SPONSORSHIP | 6 |
| SECTION FOUR: | RESIGNATION/TERMINATION | 7 |
| SECTION FIVE: | TRANSFERABILITY | 9 |
| SECTION SIX: | PROPRIETARY INFORMATION | 11 |
| SECTION SEVEN: | TRADEMARKS, LITERATURE AND ADVERTISING | 12 |
| SECTION EIGHT: | PAYMENT OF COMMISSIONS | 16 |
| SECTION NINE: | PURCHASE AND SALE OF PRODUCTS | 17 |
| SECTION TEN: | RETAIL CUSTOMER RETURNS | 21 |
| SECTION ELEVEN: | GENERAL PROVISIONS | 23 |
| SECTION TWELVE: | CODE OF PROFESSIONAL ETHICS | 26 |
| SECTION THIRTEEN: | ADDENDA FOR SPECIFIC STATES | 27 |

**APPENDIX B**

©2015 Nerium International™, LLC.   4006 Belt Line Road #100   Addison, TX 75001   Tel: 855-463-7486   Fax to: 214-390-9988   neriumsupport.   Right Reserved. R0515

**1.01 Becoming a Brand Partner.** An applicant becomes an Independent Brand Partner ("Brand Partner") of the Company when the following requirements are fulfilled:

  a) The applicant's completed Brand Partner Application and Agreement (the "Agreement") and any related documents have been received and accepted by the Company at its corporate office in Addison, Dallas County, Texas;

  b) The applicant purchases, at Company cost, a Brand Partner Launch Kit, which contains Brand Partner Forms (including, but not limited to, Brand Partner Applications and Product Order Forms), Company information and brochures, which are sales materials (not for resale). This sum is not a service or franchise fee, but rather is strictly to offset costs incurred by the Company for educational and business materials required for a Brand Partner of the Company; and

  c) The Company reserves the right to decline to accept any Agreement for any reason at its sole discretion.

**1.02 No Purchase Required.** Except as set forth above, no purchase is required to become a Brand Partner.

**1.03 Brand Partner Obligations and Rights.** A Brand Partner is authorized to sell the Company's products and services and to participate in the Company's Compensation Plan. A Brand Partner may sponsor new Brand Partners into the Company.

**1.04 Legal Age.** A Brand Partner shall be of legal age to enter into a binding contract in the state of Brand Partner's residence.

**1.05 Common Address.** No more than three (3) Brand Partners or Customers may ship product to the same shipping address.

**1.06 Married Couples.** Married couples and their dependent children shall share a single Brand Partner entity. Brand Partners who subsequently marry shall maintain separate Brand Partner status unless one is the direct Sponsor of the other, in which case their Brand Partner entities may be consolidated. When a couple sharing a Brand Partner entity divorces or separates, the Company will continue to pay commission checks in the same manner as before the divorce or separation until it receives written notice, signed by both parties or issued by a court decree, which specifies to whom future commission checks should be paid, provided the couple has complied with the requirements of Section 5.03, if applicable.

**1.07 Simultaneous Interests.** A Brand Partner and spouse and dependents may not have simultaneous beneficial interests in more than one Brand Partner position entity. For example, a shareholder of a corporation that is a Brand Partner may not become an individual Brand Partner.

**1.08 Corporations, Partnerships, Limited Liability Companies and Trusts.** Corporations, Partnerships, Limited Liability Companies or other forms of business organizations and/or trusts may become a Brand Partner of the Company when the Agreement is accompanied by copies of the following documents within thirty (30) days after the Agreement is accepted; otherwise, the Brand Partner position may go into suspension:

  a) Articles of incorporation, Partnership agreement, trust documents and/or other governing documents, as applicable;

  b) A complete list of all directors, officers and shareholders involved in a corporation, all general and limited Partners of a Partnership, members of a limited liability company or trustee(s) and beneficiaries of a trust, as applicable;

  c) A Federal ID number or other identification number as the Company may approve in its sole discretion; and

  d) Such other documents and information as may be reasonably requested from time to time.

Shareholders, directors, officers, partners, members, beneficiaries and trustees, as applicable, of a Brand Partner entity shall agree to be, and the Company will hold each personally liable, to the Company and bound by the Agreement and the Policy Manual.

**APPENDIX B**

**Page 45**

**1.09 Non-Profit Organizations.** Non-Profit Organizations may become a Brand Partner of the Company when the Agreement is accompanied by copies of the following documents within thirty (30) days after the Agreement is accepted; otherwise, the Brand Partner position may go into suspension:

a) Articles of incorporation, Partnership agreement, trust documents and/or other governing documents, as applicable;

b) A complete list of all directors and officers involved in the Non-Profit Organization and who is authorized to enter into a contract on behalf of the organization, as applicable;

c) A Federal ID number or other identification number as the Company may approve in its sole discretion;

d) Verification of 501c (3) status; and

e) Such other documents and information as may be reasonably requested from time to time.

Directors, officers, partners and members, as applicable, of a Brand Partner entity shall agree to be, and the Company will hold each personally liable, to the Company and bound by the Agreement and the Policy Manual.

**1.10 Fictitious and/or Assumed Names.** A person or entity may not apply as a Brand Partner using a fictitious or assumed name without Company approval, which may be withheld in the Company's sole discretion.

**1.11 Independent Contractor Status.** A Brand Partner is an independent contractor. Brand Partner is not a franchisee, joint venture Partner, business Partner, employee or agent of the Company, and Brand Partner is prohibited from stating or implying, whether orally or in writing, otherwise. Brand Partner has no authority to bind the Company to any obligation. The Company is not responsible for payment or co-payment of any employee benefits. Brand Partner is responsible for liability, health, disability and workmen's compensation insurance. Brand Partner sets Brand Partner's own hours and determines how to conduct Brand Partner's business, subject to the Agreement and the Policy Manual.

**1.12 Taxation.** As an independent contractor, a Brand Partner will not be treated as a franchisee, Partner, employee or agent for federal or state tax purposes including, with respect to the Internal Revenue Code, Social Security Act, federal unemployment act, state unemployment acts or any other federal, state or local statute, ordinance, rule or regulation. At the end of each calendar year, the Company will issue to each Brand Partner IRS Form 1099, or other applicable documentation required by law, for non-employee compensation of a Brand Partner.

**1.13 Legal Compliance.** A Brand Partner shall comply with all federal, state and local statutes, regulations and ordinances concerning the operation of Brand Partner's business. A Brand Partner is responsible for Brand Partner's own managerial decisions and expenditures, including all estimated income and self-employment taxes.

**1.14 Brand Partner Identification Number.** A Brand Partner is required by federal law to obtain a Social Security number, Federal ID. number or other approved government-issued identification based on their resident country. Brand Partners will be assigned a Nerium International ID number for purposes of the Brand Partner's business with the Company. This number shall be placed on all orders and correspondence with the Company, hereinafter referred to as the Brand Partner Identification Number ("BPIN"). The Company will use this number in all internal Brand Partner transactions. Any penalties or fines that may result from the use of an incorrect tax identification number furnished to the Company will be the responsibility of Brand Partner.

**1.15 No Exclusive Territories.** There are no exclusive territories for marketing or sponsoring purposes, nor shall any Brand Partner imply or state that Brand Partner has an exclusive territory. No franchise is granted and there are no exclusive territories for sales or sponsoring purposes. No geographical limitations exist on Brand Partner sponsoring within the United States or any country in which the Company is approved to do business.

**1.16 Other Products.** A Brand Partner agrees that no products except the Company's products shall be sold or shown at any event where the Company's products are sold or shown. During the term of the Brand Partner Agreement, and for a period of six months thereafter, Brand Partner is prohibited from selling or promoting any competing products or services or marketing programs to any of the Company's Employees, Agents or Brand Partners, except those Brand Partners personally sponsored by Brand Partner. Any Brand Partner found in violation of this subsection risks the loss of buying privileges, possible suspension and/or termination of Brand Partner position and participation in the Company Compensation Plan, and the Company will pursue all legal recourses to recover damages.

**1.17 Cross-Group Selling.** Selling to other Company Brand Partners in order to receive credit for bonuses and advancement is prohibited. Brand Partner shall obtain all of Brand Partner's Company products, literature and materials directly from the Company. Any violation of this rule subjects Brand Partner to possible suspension and/or termination.

**1.18 Contacts.** Brand Partners are to limit all corporate communication to the office and staff of the Company. No direct contact is to be made with the Company's partners, suppliers, consultants or hired professionals without the express written approval of the Company.

©2015 Nerium International™, LLC.   4006 Belt Line Road #100   Addison, TX 75001   Tel: 855-463-7486   Fax to: 214-390-9988   neriumsupport.com   All rights reserved. R0515

**2.01** **Term.** Subject to the provisions of Section Four, the Agreement shall have a term beginning on the date of acceptance by the Company and ending one year from the date thereof (the "Anniversary Date").

**2.02** **Annual Renewal.** A Brand Partner authorizes Company to automatically renew their Brand Partner's status annually. The annual renewal fee is posted in the Online Business Center or is available through Nerium Support and is due on the Anniversary Date of enrollment. A Brand Partner not renewing by the renewal date, as provided herein, shall be deemed to have voluntarily terminated their Brand Partner position relationship with the Company and will thereby lose their Brand Partner position, all sponsorship rights, their position in the Compensation Plan, all rights to commissions and bonuses and the ability to purchase products from the Company at wholesale prices. A Brand Partner who fails to renew his/her Brand Partner status may not reenroll under a new Sponsor for six (6) months after non-renewal.

**2.03** **Inactivity.** A Brand Partner who is "inactive" in any 180 consecutive-day period shall be automatically deactivated from Brand Partner status and converted to Retail Customer status instead.

**APPENDIX B**

**Page 48**

©2015 Nerium International™, LLC.   4006 Belt Line Road #100   Addison, TX 75001   Tel: 855-463-7486   Fax to: 214-390-9988   neriumsupport.   rights reserved. R0515

**3.01 Sponsoring.** A Brand Partner may sponsor other Brand Partners in the United States and any country in which the Company is authorized. Sponsors shall ensure that each new Brand Partner has received, had access to and understands the Company's Agreement, the Policy Manual and the Compensation Plan. A Brand Partner will be compensated only for the generation of sales volumes, not for sponsoring new Brand Partners into the program.

**3.02 Multiple Agreements.** If an applicant submits multiple Agreements that list different Sponsors, only the first completed Agreement to be received by the Company will be accepted. The decision of the Company in recognizing the official Sponsor is final.

**3.03 Training Requirement.** Brand Partners are required to assure the adequate training of Brand Partners they sponsor. A Sponsor shall maintain an ongoing professional leadership association with Brand Partners in the organization and shall fulfill the obligation of performing a bona fide supervisory, distribution and selling function in the sale or delivery of products and services. Upon request, a Brand Partner must be able to provide the Company with evidence of ongoing fulfillment of Sponsor responsibilities, including training.

**3.04 Income Claims.** No income projections, including those based solely on mathematical projections or "ideal projections" of the Company Compensation Plan may be made to prospective Brand Partners. Brand Partner shall not represent Brand Partner's income as an indication of the success assured to others, since income success depends upon many variables. Commission checks may not be used as marketing materials. Brand Partner shall not guarantee or estimate compensation, draws, expenses or deductions attributable to the business to prospects. Brand Partner shall truthfully and fairly describe and present the Compensation Plan. No past, potential or actual income claims may be made to prospective Brand Partners. Brand Partner may not guarantee commissions or estimate expenses to prospects.

**3.05 Transfer of Sponsorship.** Although it is strongly discouraged and is seldom permitted, a Brand Partner may transfer to a different Sponsor or Sponsorship line, subject to the written approval of the Company, which may be withheld in its sole discretion, subject to the following conditions:

a) If the transferring Brand Partner is within the same Sponsorship group, notarized signatures are required from all Brand Partners that are, or may be impacted, by the move;

b) If the transferring Brand Partner is outside the same Sponsorship group, a notarized statement signed by all affected upline Brand Partners shall be submitted reflecting that each affected party understands and consents to the transfer. Any request for transfer of Sponsorship shall be first submitted to the Company in writing explaining the reason for the request of transfer;

c) A $50.00 transfer fee shall be paid to the Company;

d) A written request for transfer explaining the exact reason for the requested transfer shall be submitted to the Company; and

e) The final approval of the Company, if granted, will apply only to the Brand Partner making the request and not the Brand Partner's downline organization. Brand Partner shall comply with the requirements of section 5.03.

**3.06 Preferred Customers Associated with Brand Partner.** As a general matter, Nerium recognizes that a potential Brand Partner should be entitled to sign on with any Brand Partner sponsor of their choosing. However, a unique circumstance exists when an existing Brand Partner has undertaken a very serious sales and relationship effort to cause a prospective customer to become, not merely a one-time retail customer, but a committed Preferred Customer. In this situation, Nerium has determined that the very serious efforts of the selling Brand Partner should be honored and respected. To this extent, Nerium has adopted a policy that a Preferred Customer who decides to become a Brand Partner will be deemed to be associated and sponsored by the original Brand Partner who originally expended the effort to sign up the customer as a Preferred Customer.

**APPENDIX B**

**Page 49**

©2015 Nerium International™, LLC.   4006 Belt Line Road #100   Addison, TX 75001   Tel: 855-463-7486   Fax to: 214-390-9988   neriumsupport.   ⸻ghts reserved. R0515

**4.01 Voluntary Resignation.**

    a) A Brand Partner may voluntarily terminate Brand Partner's status by failing to renew or by sending a written notice of resignation or termination to the Company. Voluntary resignation is effective upon receipt of such notice by the Company.

    b) A Brand Partner who resigns or terminates Brand Partner's status may reapply as a brand Partner at an entry-level position six (6) months after resignation.

    c) When a Brand Partner voluntarily terminates the Agreement, Brand Partner's sales network shall automatically roll up to the first upline Brand Partner.

**4.02**   **Suspension.** A Brand Partner may be suspended for violating the terms of the Agreement, which includes this Policy Manual, the Compensation Plan and other documents produced by the Company. When a decision is made to suspend Brand Partner, the Company will inform Brand Partner in writing that the suspension has occurred effective as of the date of the written notification, the reason for the suspension and the steps necessary to remove such suspension, if any. The suspension notice will be sent to Brand Partner's address on file with the Company pursuant to the notice provisions contained in the Policy Manual. Such suspension may or may not lead to termination of Brand Partner's position as so determined by the Company in its sole discretion. If Brand Partner wishes to appeal, the Company shall receive such appeal in writing within fifteen (15) days from the date of the suspension notice. The Company will review and consider the suspension and notify Brand Partner in writing of its decision within thirty (30) days from the date of the suspension notice. The decision of the Company will be final and subject to no further review. The Company may take certain action during the suspension period, including, but not limited to, the following:

    a) Prohibiting Brand Partner from holding Brand Partner meeting or outing as a Brand Partner of the Company or using any of the Company's proprietary marks and/or materials;

    b) Withholding commissions and bonuses due Brand Partner during the suspension period;

    c) Prohibiting Brand Partner from purchasing services and products from the Company; and/or

    d) Prohibiting Brand Partner from sponsoring new Brand Partners, contacting current Brand Partners or attending meetings of Brand Partners.

    e) If the Company, in its sole discretion, determines that the violation that caused the suspension is continuing, has not been satisfactorily resolved, or a new violation involving the suspended Brand Partner has occurred, the suspended Brand Partner may be terminated.

**4.03**   **Termination.** Brand Partner may be terminated for violating the terms of the Agreement, which includes this Policy Manual, the Compensation Plan and other documents produced by the Company. The Company may terminate a violating Brand Partner without placing Brand Partner on suspension, in the Company's sole discretion. Brand Partner will be given notice of the opportunity to be heard by a panel to consider the issues relating to the grounds for termination. When the decision is made to terminate Brand Partner, the Company will inform Brand Partner in writing at the address in Brand Partner's file that the termination has occurred effective thirty (30) days from the date of the written notification.

**4.04**   **Appeal.** If Brand Partner wishes to appeal the termination, the Company must receive the appeal in writing within fifteen (15) days from the date of notice of termination. If no appeal is received within the fifteen (15) day period, the termination will automatically be deemed final. If Brand Partner files a timely notice of appeal, the Company will review the appeal and notify Brand Partner of its decision within ten (10) days after receipt of the appeal. The decision of the Company will be final and subject to no further review. In the event the termination is not rescinded, the termination will remain effective as of the date stated in the original termination notice.

**4.05**   **Effect of Termination.** Immediately upon termination, the terminated Brand Partner:

    a) Shall remove and permanently discontinue the use of the trademarks, service marks, trade names and any signs, labels, stationery or advertising referring to or relating to any Company product, plan or program;

    b) Shall cease representing themselves as a Brand Partner of the Company;

    c) Shall lose all rights to Brand Partner's position and position in the Compensation Plan and to all future commissions and bonuses resulting there from; and

**APPENDIX B**

**Page 50**

d) Shall take all action reasonably required by the Company relating to protection of its confidential information. The Company has the right to offset any amounts owed by Brand Partner to the Company from commissions or other bonuses due to Brand Partner. The Company may also offset an estimate of the reasonable amount that Brand Partner owes under the terms of the indemnity obligation incurred pursuant to Section 11.01 herein.

**4.06  Reapplication.** The acceptance of any reapplication of a terminated Brand Partner, or the application of any family member of a terminated Brand Partner, shall be in the sole discretion of the Company and may be denied.

**4.07  State Laws.** Where these provisions on termination violate the public policy of state laws, the applicable state law shall apply.

8 of 30        ©2015 Nerium International™, LLC.   4006 Belt Line Road #100   Addison, TX 75001   Tel: 855-463-7486   Fax to: 214-390-9988   neriumsupport.com   All rights reserved. R0515

**5.01 Acquisition of Business.** Any Brand Partner desiring to acquire an interest in another Brand Partner's business shall first terminate his her Brand Partner position and wait six (6) months before becoming eligible for such a purchase. All such transactions shall be fully disclosed to the Company and are subject to approval by the Company in advance.

**5.02 Transfers to Brand Partner.** Except as expressly set forth herein, Brand Partner may not sell, assign or otherwise transfer Brand Partner's entity (or rights thereto) to another Brand Partner or to an individual who has an interest in Brand Partner entity. Notwithstanding the foregoing, a Brand Partner may transfer the Brand Partner position to the Sponsor, subject to the conditions of Section 5.03. In such event, the Sponsor's Brand Partner position and the transferring Brand Partner's Brand Partner position shall be merged into one entity.

**5.03 Conditions to Transferability.** Brand Partner may not sell, assign, merge or transfer Brand Partner's position (or rights thereto) without the prior written approval of the Company, and any such transfer, if approved, is subject to the following conditions:

a) Brand Partner must be in good standing, and must strictly adhere to all Nerium Policies and Procedures and not currently be on probation or suspension for Policy Compliance Violations.

b) The Company possesses the right of first refusal with respect to any sale, assignment, transfer or merger of any Brand Partner position. A Brand Partner wishing to sell, assign, transfer or merge the Brand Partner position shall first provide the Company with the right and option to make such a purchase or receive such transfer in writing on the same terms and conditions as any outstanding offer. The Company will advise Brand Partner within ten (10) business days after receipt of such notice of its decision to accept or reject the offer. If the Company fails to respond within the ten (10) day period or declines such offer, Brand Partner may make the same offer or accept any outstanding offer which is on the same terms and conditions as the offer to the Company to any person or entity who is not a Brand Partner, married to or a dependent of a Brand Partner or who has any interest in a Brand Partner position.

c) The selling Brand Partner shall provide the Company an executed "Sale of Nerium International Brand Partner Position" form and with a copy of all documents which detail the transfer, including without limitation, the name of the purchaser, the purchase price and terms of purchase and payment;

d) A transfer fee of $50.00 shall accompany the transfer documents;

e) The documents shall contain a covenant made by the selling Brand Partner for the benefit of the proposed purchaser not to compete with the purchaser or attempt to divert or sponsor any existing Brand Partner of the Company for a period of six (6) months from the date of the sale or transfer; and

f) Upon approval of sale, transfer or assignment being approved, the seller must provide a notarized Bill of Sale for the position being sold as proof of payment of the stated purchase price before the position will be transferred to the potential buyer. Upon approval by the Company in writing, the buying party shall assume the position of the selling Brand Partner and shall execute a current agreement and all such other documents as may be reasonably required by the Company.

g) The Company reserves the right, in its sole discretion, to stipulate additional terms and conditions prior to approval of any proposed sale or transfer. The Company reserves the right to disapprove any sale or transfer.

h) A Brand Partner must have had a completed product sale in the last 90 days.

i) Brand Partner must have enrolled or renewed their Brand Partner position within the last twelve (12) months or have an active Auto-Delivery template and an active Auto-Delivery Order that was paid with the selling Brand Partner's credit card and shipped to the shipping address on their customer record within the last 30 days.

**APPENDIX B**

 ©2015 Nerium International™, LLC.   4006 Belt Line Road #100   Addison, TX 75001   Tel: 855-463-7486   Fax to: 214-390-9988   neriumsupport... ...eserved. R0515

j) A Brand Partner position being sold must have personally sponsored at least one (1) Brand Partner in the last twelve (12) months.

k) The new owner will assume the original enrollment date of the position being sold.

l) If the position enrollment date is thirty (30) days or greater, the new owner will not be eligible to earn an iPad.

m) If the position being purchased has achieved a rank of Senior Director or higher, the purchaser must maintain a "Paid As" rank equal to the Highest Achieved rank for that position for ninety (90) days before they may be eligible to receive the benefits of the Lexus program.

**5.04 Circumvention of Policies.** If it is determined, in the Company's sole discretion, that a Brand Partner position was transferred in an effort to circumvent compliance with the Agreement, this Policy Manual or the Compensation Plan, the transfer will be declared null and void, and the Brand Partner position will revert back to the transferring Brand Partner who will be treated as if the transfer had never occurred from the reversion day forward. If necessary, and in the Company's sole discretion, appropriate action, including without limitation, termination may be taken against the transferring Brand Partner to ensure compliance with the Agreement and this Policy Manual.

**5.05 Succession.** Notwithstanding any other provision of Section Five, upon the death of a Brand Partner, the Brand Partner's position will pass to Brand Partner's successors in interest as provided by law; however, the Company will not recognize such a transfer until the successor in interest has executed a current Agreement and submitted certified copies of the death certificate and will, trust or other instrument required by the Company to evidence transfer of ownership. The successor will thereafter be entitled to all the rights and be subject to all the obligations of a Company Brand Partner.

**5.06 Reentry.** Any Brand Partner who transfers their Brand Partnership shall wait for six (6) months after the effective date of such transfer before becoming eligible to reapply to become a new Brand Partner.

**APPENDIX B**

**Page 53**

©2015 Nerium International™, LLC.   4006 Belt Line Road #100   Addison, TX 75001   Tel: 855-463-7486   Fax to: 214-390-9988   neriumsupport.com   All rights reserved. R0515

**6.01 Confidentiality Agreement.** During the term of the Agreement, the Company may supply to Brand Partner confidential, proprietary or trade secret information including, but not limited, to genealogical and downline reports, customer lists, customer information developed by the Company or developed for and on behalf of the Company by Brand Partner (including, but not limited, to credit data, customer and Brand Partner profiles and product purchase information), Brand Partner lists, manufacturer and supplier information, business reports, commission or sales reports and such other financial and business information which the Company may designate as confidential, proprietary or trade secret. All such information (whether in written or electronic form) is confidential, proprietary or trade secret to the Company and is transmitted to Brand Partner in strictest confidence on a "need to know" basis for use solely in Brand Partner's business with the Company. Brand Partner shall use Brand Partner's best efforts to keep confidential, proprietary or trade secret information protected and shall not disclose any such information to any third party, directly or indirectly. Brand Partner shall not use the information to compete with the Company or for any purpose other than promoting the Company's program and its products and services. Upon expiration, non-renewal or termination of the Agreement, Brand Partner shall discontinue the use of such confidential, proprietary or trade secret information and promptly return any confidential, proprietary or trade secretinformation in their possession to the Company.

**6.02 Copyright Restrictions.** With respect to product purchases from the Company, Brand Partner shall abide by all manufacturers' use restrictions and copyright protections.

**6.03 Vendors' and Other Business Associates' Confidentiality.** The Company's business relationships with its vendors, manufacturers, suppliers and researchers are confidential. Brand Partner shall not contact, directly or indirectly, speak to or communicate with any supplier, manufacturer or researcher of the Company except at a Company-sponsored event at which the supplier, manufacturer or researcher is present at the request of the Company.

**APPENDIX B**

**Page 54**

 ©2015 Nerium International™, LLC.   4006 Belt Line Road #100   Addison, TX 75001   Tel: 855-463-7486   Fax to: 214-390-9988   neriumsupport.com   All rights reserved. R0515

### 7.01 Trademarks.

   a) The Company's name, trademarks, service marks and copyrighted materials are owned by the Company, including the names of the Company's products. The use of such marks and materials shall be in strict compliance with the Policy Manual. Only the Company is authorized to produce and market products and literature under these trademarks. Use of the Company name on any item not produced or authorized by the Company is prohibited, except in the manner described below:

   Mary Jones
   Independent Brand Partner
   Nerium International™

   b) Trademark usage, unless otherwise as stated above: Independent Brand Partners who wish to use the Company's name, trademarks, service marks and copyrighted materials for Internet marketing purposes only will have the option to participate in the Company's Internet Licensee Program, and must adhere to the Company's Policies within this document, as well as the requirements of the program. Email compliance@nerium.com for additional information.

### 7.02 Telephone, Yellow and White Page Listing.
Brand Partner is not permitted to use the Company's trade name in advertising in the white or yellow page sections of the telephone book. Brand Partner is not permitted to list their telephone numbers under the Company's trade name without first obtaining prior written approval from the Company. If approval is granted for a listing, it shall be stated in the following manner:

   Jones, Mary
   Independent Brand Partner
   Nerium International™

### 7.03 Imprinted Checks.
Brand Partner is not permitted to use the Company trade name or any of its trademarks or service marks on their business or personal checking accounts; however, Brand Partner may imprint Brand Partner's business checks as being a "Nerium International™, LLC Independent Brand Partner."

### 7.04 Imprinted Business Cards or Letterheads.
Brand Partner is not permitted to "create" Brand Partner's own stationary, business cards or letterhead graphics if the Company's trade name and/or trademarks are used. Only the approved Company graphics version and wording are permitted and letterhead shall be ordered either from the Company directly or from the Company-licensed independent contractor.

### 7.05 Print and Electronic Advertising.
Only Company-produced or -approved (in writing and in advance) promotional and advertising materials may be used to advertise or promote a Brand Partner's business or sell products or services of the Company in any print or electronic media, including on an Internet website. No person shall use the Company name, logos, trademarks or copyrighted material in any advertising not produced by the Company or without prior express written permission from the Company. The Company's literature and materials may not be duplicated or reprinted without prior written permission of the Company. The Company's consent or approval may be withheld at its sole discretion. Banners, trade show materials and the like must be approved in writing by the Company.

### 7.06 Internet.
The Company maintains a presence on the Internet on its own website. Brand Partner is prohibited from using any trademarks of Company, including the name Nerium International™, LLC, the Nerium International™, LLC logo, and the name of any of the products, or any other trade names, trademarks or distinctive phrases or remarks used by Company, including those related to any product or any term confusingly similar thereto - in any form on the internet. If a Brand Partner desires to provide a link from Brand Partner's personal web site directly to the Company's website, the Brand Partner's request must be in writing and is subject to Company approval in its sole discretion. No link may be established until the Brand Partner receives written approval from Nerium International.

### 7.07 Protection of Minors.
The Nerium International website is not designed for or targeted at children. We do not knowingly collect, use or disseminate any personally identifiable information from children under the age of 18. If, however, we become aware that personally identifiable information regarding a child under the age of 18 has been collected at the Nerium International site, we will use such information for the sole purpose of contacting a parent or guardian of the child to obtain verifiable parental consent. If we cannot obtain consent after a reasonable period of time, or if when contacted, a parent or guardian requests that we do not use or maintain such information, we will make reasonable efforts to delete it from our records. Upon request by a parent or guardian, Nerium International will provide a description of the specific types of personal information collected from a child who is under the age of 18.

**APPENDIX B**

**Page 55**

©2015 Nerium International™, LLC.   4006 Belt Line Road #100   Addison, TX 75001   Tel: 855-463-7486   Fax to: 214-390-9988   neriumsupport.com   All rights reserved. R0515

**7.08 Gifts, Enticement and Special Discounts.**

a) Nerium Independent Brand Partners are prohibited from using print, electronic or verbal advertisements to entice potential prospects, including Preferred Customers, to join their organization or team, which includes, but is not limited to; special rewards, incentives, bonuses, products or guarantee of downline placements, which can be determined upon Company's sole discretion.

b) Nerium Independent Brand Partners are not allowed to use the Placement Suite as a form of incentive and/or enticement to leverage potential prospects, including Preferred Customers, in any public or private forum for joining their Nerium business.

**7.09 Social Media.**

a) As a Brand Partner for Nerium International, you are not required to maintain a presence in social media. Should you choose to do so, however, you must adhere to the guidelines and policies set forth by Nerium International. These guidelines and policies are designed to ensure the uniformity and professionalism of the Nerium International brand which, in turn, benefits your business.

b) Nerium International maintains an online presence for the benefit of the company as a whole, which includes Customers, Brand Partners and the general public. We ask that in our public forums (Facebook, Twitter, etc.) you keep your comments relevant to all. Our blog (neriumblog. net) is a resource for you to ask questions related to the business side of Nerium International, and our corporate staff is available to help.

c) You may not use the official corporate Nerium pages to drive business, solicit business, drive people to your own site or recruit Brand Partners. Our trademarked brand name cannot be used to drive traffic away from our corporate site.

d) You cannot represent your independent business as the corporate office. All Brand Partner communications, both in print and online, must clearly appear as coming from an independent representative of the company and not lead the consumer to think they may be interacting with the corporate office.

e) You are welcome to use the term "Independent Brand Partner for Nerium International" in the name/description of various social media sites for your business. You cannot use the word "official" or anything similar. You cannot create an alias for any sites like Twitter or others that use any permutation of the Nerium International name. For further clarification regarding naming, please refer to Section 7.06.

f) When posting information online related to Nerium International, please consider if the information you are sharing is beneficial to your business and to the company as a whole. Do not represent yourself in any way online that detracts from the Nerium International brand. All Independent Brand Partners agree, acknowledge and affirmatively accept any content posted (photos, testimonials, statements, marketing materials, etc.) on a social networking website including, but not limited to, Facebook, Twitter, MySpace, LinkedIn, Flickr, etc., must adhere to the Print and Electronic Guidelines found in Section 7.05. Health/medical claims, income claims or disparaging comments, remarks, etc are expressly prohibited and will not be approved or allowed.

g) In the event of your voluntary or involuntary termination as a Nerium International Independent Brand Partner, you are required to remove all references to Nerium International from social networking profile(s) within ten (10) days.

h) Should Nerium International discover non-compliant profiles and/or websites, you will be required to remove the material immediately.

i) Infractions of any social media guideline may result in disciplinary actions up to and including termination of your Brand Partner account.

j) Nerium International requires that all Brand Partners identify themselves as independent business owners and should therefore adhere to the naming convention of their Facebook page and all other social media networks to read as follows: "John Doe, Independent Brand Partner, Nerium International." On Facebook only are you allowed to use "Nerium" in your vanity URL if its naming convention is the same as your Nerium replicated site i.e. "Facebook.com/john doe.nerium". This is the only acceptable use of the word "Nerium" in a URL.

k) All Independent Brand Partners are prohibited from advertising "Nerium" on websites such as Groupon, Facebook offers, Twitter ads, or any website or social media networks with a coupon or special discount offer, including and not limited to the purchase of ads with the "Nerium" name used in the naming conventions of URL domains, subdomains or in the advertising on pay per click ads and/or adwords, etc.

**APPENDIX B**

**Page 56**

©2015 Nerium International™, LLC.   4006 Belt Line Road #100   Addison, TX 75001   Tel: 855-463-7486   Fax to: 214-390-9988   neriumsupport.   All rights reserved. R0515

**7.10 Endorsements.** No endorsements by a Company officer or any third party may be asserted, except as expressly communicated in the Company literature and communications. Federal and state regulatory agencies do not approve or endorse direct selling programs. Therefore, a Brand Partner may not represent or imply, directly or indirectly, that the Company's program, products or services has been approved or endorsed by any governmental agency.

**7.11 Independent Communications.** Subject to the restrictions imposed by Section Seven, Brand Partner is encouraged to distribute information and direction to Brand Partner's respective downline; however, Brand Partner shall identify and distinguish between personal communications and the official communications of the Company.

**7.12 Medical Claims.** No medical claims (expressed or implied) may be made for any Company product by Brand Partner.

**7.13 Brand Partner Services.** The Company provides every active Brand Partner with management and training communications, timely delivery of product and sales materials and a computer report of sales made in their marketing group for the pay period in which commissions and overrides are earned and paid.

**7.14 Pricing.** Pricing for products sold on the Internet must adhere to the general rules for all such retail sales, as outlined in Section 9.13.

**7.15 Recordings.** Brand Partner may not produce or reproduce for sale or personal use products sold by the Company or any Company-produced literature, audio or video material, presentations, events or speeches, including conference calls. Video and/or audio taping of Company meetings and conferences is strictly prohibited. Still photography is allowable at the discretion of the meeting host.

**7.16 Telephone Answering.** Brand Partner may not answer the telephone by saying "Nerium International" or in any other manner that would lead the caller to believe that the call has reached the corporate offices of the Company.

**7.17 Liability.** Violation of any of the rules contained in this Policy Manual is grounds for termination of the individual's Brand Partner status. The violator may also be liable for damages resulting from unauthorized use of the Company copyrights, trademarks and materials.

**7.18 iPad Incentive Rules.** There can be no mention of iPad in any type of promotion or incentive program that is presented to the public at large, either in print or electronically. It is not acceptable to have a picture of someone with his or her iPad and communication involving the iPad cannot explain how to win, earn or obtain an iPad by working with Nerium.

**7.19 Lexus and iPad Payout Option.**

    a) Lexus bonus earners who choose the Nerium bottle option will receive four (4) bottles of Age-Defying Night Cream and four (4) bottles of Age-Defying Day Cream, and receive this payout option up to a maximum of six (6) qualifying months. The Lexus Car Payment Option will remain available once the bottles option has ended.

    b) iPad bonus earners who choose the Nerium bottle option will receive a one (1) time pay out of four (4) bottles of Age-Defying Night Cream and four (4) bottles of Age-Defying Day Cream.

**APPENDIX B**

**Page 57**

 ©2015 Nerium International™, LLC.   4006 Belt Line Road #100   Addison, TX 75001   Tel: 855-463-7486   Fax to: 214-390-9988   neriumsupport.         Rights Reserved. R0515

**8.01** **Basis for Commissions.** Commissions. Commissions and other bonuses cannot be paid until a completed Agreement has been received and accepted by the Company prior to the end of the month in which the sale is made. Commissions are paid ONLY on the sale of Company services and products. No commissions are paid on the purchase of a Brand Partner kit or for sponsoring Brand Partners.

**8.02** **Calendar.** Commissions, overrides and bonuses are calculated and paid on the current pay period information. A Brand Partner is promoted to the highest rank in which he/she qualifies at the close of each bonus period. Commissions and bonuses are paid based on the "Paid As" rank.

**8.03** **Commission and Bonus Payment Date.** Commissions, overrides and bonuses are calculated and paid on the current pay period information. A Brand Partner is promoted to the highest rank in which he/she qualifies at the close of each bonus period. Commissions and bonuses are paid based on the "Paid As" rank.

**8.04** **Minimum Payment.** The minimum amount for payment of commissions and overrides is $15.00; all monies not paid will be included in the next bonus payment. Processing fees vary based on payment options and may be deducted from all commission and bonus payments.

**8.05** **Offset of Commissions.** Any commissions or bonuses earned and paid on products returned is the obligation of and shall be repaid to the Company by the Brand Partner originally paid such commissions or bonuses. The Company has the right to offset such amounts against future commissions and other bonuses paid or owed to such Brand Partner and Brand Partner's upline who participated in an override.

**8.06** **Tax Reporting for Commissions.** Any commissions paid to a Brand Partner are subject to State and Federal tax laws. Payments made in the form of incentive trips, free product (3UR Free, NGB, in lieu of Lexus lease) and/or Lexus car payments are all subject to taxation as income and will be reported annually on a 1099 prepared for the Brand Partner. The Brand Partner is responsible to file all income and expense reports appropriate for operating a home-based business.

**APPENDIX B**

**Page 58**

©2015 Nerium International™, LLC.   4006 Belt Line Road #100   Addison, TX 75001   Tel: 855-463-7486   Fax to: 214-390-9988   neriumsupport. All rights reserved. R0515

**9.01 Purchase Requirement.** No product purchase is required in order for an applicant to become a Brand Partner, although purchases or sales of products may be required in order to advance in the Compensation Plan. Brand Partners who have had their Agreement accepted by the Company may buy products at wholesale prices directly from the Company.

**9.02 Stockpiling Prohibited.** The success of the Company depends on sales to the ultimate consumer and all forms of stockpiling are strictly prohibited including, but not limited to, purchases of products primarily for purposes of qualifying for additional compensation. The Company recognizes that Brand Partner will purchase products for Brand Partner's own use, however, the Company strictly prohibits the purchase of products in unreasonable amounts in an attempt to qualify for advancement in the Compensation Plan.

**9.03 70% Rule.** In order to qualify for commissions and bonuses, Brand Partner shall certify on the product order form that the Brand Partner has sold to non-Brand Partner consumers or used at least 70% of all products previously purchased. Brand Partners placing telephone orders to the Company are also required to comply with this rule and may be requested by the Company to verify compliance. In its effort to support and enforce the retail sales/70% Rule, the Company, on a quarterly basis, will conduct random audit verification follow-ups. Representatives of the Company will contact Brand Partners to further verify compliance with the 70% Rule. Brand Partners should maintain records and be prepared to assist the Company representative in their task.

**9.04 Retail Sales Rule.** Requiring sales to at least five (5) retail customers per month.

**9.05 Preferred Customer Rules.** A Preferred Customer must personally opt in to the monthly Auto-Delivery Order program. Invalid Preferred Customer orders are defined as orders submitted as Preferred Customer orders for qualification purposes without the written authorization from the customer. If a Nerium International Brand Partner submits a Preferred Customer order without the Customer's consent, the Brand Partner will be subject to disciplinary action, including termination. Preferred Customer orders cannot be paid by or shipped to a Nerium International Brand Partner for any reason. No exceptions.

**9.06 Ordering Methods.** All orders submitted to the Company shall have the Brand Partner's or Customer's Company issued identification number placed thereon to assist the Company in processing and shipping the order properly. Failure to provide this information may result in a delay in processing the order.

**9.07 Direct Purchase.** Brand Partner may purchase Brand Partner's product needs directly from the Company. Should a Brand Partner obtain product from Brand Partner's Sponsor or upline Brand Partner's personal inventory and a replacement product order is not placed and processed through the Company, no commissions or overrides will be paid by the Company on such transactions.

**9.08 Payment Options.** Purchases may be paid by money order, cashier's check, personal check or credit cards, unless specifically stated otherwise by the Company. Pre-printed name, physical address and phone number must be on all checks. Personal checks will be accepted only for payments in an amount not greater than $1,000. In the event a check or credit card is declined, Brand Partner will be contacted for an alternate form of payment and may be subject to an additional processing fee. No orders will be shipped without prior payment. Returned checks are subject to a $30.00 returned check fee.

**9.09 Shipping and Handling.** It is the ordering Brand Partner's sole responsibility to indicate (a) the method and means of shipping and (b) the destination address.

**9.10 Product Delivery.** Upon clearance of payment, the Company processes for shipment the products and materials ordered. If an item is temporarily not available ("TNA"), the consignee will be notified on the packing list included with the shipment. If a TNA should occur, the item(s) will be shipped as soon as available and usually within ten (10) days of the date the original order was received. Back orders may be canceled by Brand Partner by written request received by the Company prior to shipment.

**APPENDIX B**

**Page 59**

©2015 Nerium International™, LLC.   4006 Belt Line Road #100   Addison, TX 75001   Tel: 855-463-7486   Fax to: 214-390-9988   neriumsupport.           rights reserved. R0515

**9.11 Damaged Goods.** The shipping company is responsible for any damage that occurs after it takes physical custody of the products. Therefore, it is important that the damage is reported promptly in order to allow Nerium International to file a claim with the shipper. The purchaser of Company products who receives damaged goods shall comply with the following procedures:

a) Accept delivery;

b) Before the driver leaves, note on the delivery receipt the number of boxes that appear to be damaged and require the driver to acknowledge the damage in writing;

c) Save the damaged products or boxes for inspection by the shipping agent; and

d) Contact Nerium International Support Department to arrange for a replacement order to be shipped and a damaged goods claim to be filed.

**9.12 Price Changes.** Prices for the Company's products, services and literature are subject to change without prior notice.

**9.13 Receipts for Retail Pricing.** Brand Partner will provide all retail purchasers of the Company products with written receipts. Although the Company provides a suggested retail price as a guideline, Brand Partner may sell the Company products at whatever retail price they and their customers may agree upon, as long as the price is not below the Preferred Customer price.

**9.14 Sales Tax.** To ensure compliance with the sales and use tax requirement of each state, unless required otherwise by state law, the Company may, at its option, collect and remit all applicable sales and use taxes on products, promotional materials and services sold to Brand Partners and retail customers based on the suggested retail price of the product. The applicable rate of tax due shall be based on the address to which the product and/or material are shipped. If Brand Partner requests a tax exempt purchase for products purchased for resale (not for personal use), Brand Partner shall provide the Company with a true and correct copy of a current resale certificate from the applicable state.

**9.15 Shipping Loss.** The Company will track all deliveries shipped. Brand Partner should contact the Company immediately upon being made aware of any shipping problem.

**9.16 Inaccurate Delivery.** If a product is shipped in error by the Company, the unordered merchandise may be returned at the Company's expense provided the following steps are taken:

a) Brand Partner or retail customer notifies the Company within five (5) days of receipt of the order;

b) A copy of the shipping or packing slip shall be enclosed with the proper forms required by the Company completed and executed by Brand Partner or retail customer; and

c) Products shall be returned in original containers and shall be packed properly to prevent damage in return shipment.

**9.17 Refused Shipments.** Should Brand Partner refuse delivery on any order placed with the Company, the Company shall have the right to place Brand Partner in suspension pending resolution of the refusal of delivery. Neither Brand Partner nor a retail customer shall refuse any shipment from the Company unless prior approval of the Company has been obtained. Should the receiving party of any order shipped from the Company refuse to accept delivery and the shipment is returned to the Company, the ordering Brand Partner's status will be suspended pending resolution of the delivery refusal. Non-accepted delivery charges will be debited to Brand Partner's account. If the Company determines that a valid reason exists for refusing shipment, it will instruct the Brand Partner or retail customer on the proper procedure for a return.

**9.18 Retail Outlets.** The integrity of the Company's marketing plan is built upon person-to-person, one-on-one and in-home presentation methods of sale. Selling Company products through any chain of retail stores, including but not limited to drugstores, pharmacies, supermarkets, health food stores, shopping mall booths and the like, restaurants or online shopping malls including, but not limited to, eBay, Craigslist, etc. is strictly prohibited. Selling Company products by Brand Partners through retail outlets or professional offices that are not part of chains and are owned or operated by the Brand Partner is acceptable upon written approval by the Company.

**9.19 Service-Oriented Establishments.** It is permissible to take orders for Company products in businesses such as health spas, health resorts or similar establishments.

**9.20 Medical Offices.** Medical doctors and other health professionals may sell Company products from their offices only if the doctor or health professional is a Brand Partner.

**APPENDIX B**

**Page 60**

©2015 Nerium International™, LLC.   4006 Belt Line Road #100   Addison, TX 75001   Tel: 855-463-7486   Fax to: 214-390-9988   neriumsupport... ...served. R0515

**9.21 Trade Shows.** With written authorization from the Company, Company products or services and opportunity may be displayed at trade shows by Brand Partners. Request for participation in trade shows must be received in writing by the Company at least two weeks prior to the show. Written authorization from the Company must be received before participating in the trade show. Unless written authorization is secured from the Company, Company products or services and opportunity are the only products or services and/or opportunity that may be offered in the trade show booth. Only Company produced marketing materials may be displayed or distributed. No Brand Partner may sell or promote the Company's products or services or business opportunity at flea markets, swap meets or garage sales. Company tradeshow authorization does not guarantee exclusive participation in any tradeshow.

**9.22 International Sales.** No independent Brand Partner may export or sell directly or indirectly to others who export the Company's products, literature, sales tools or promotional material relating to the Company, its products or services or the Company's program from the United States or its possessions or territories to any other country. Independent Brand Partners who choose to sponsor internationally may do so only in countries in which the Company has registered to operate its business and must comply fully with the Rules of Operation of a Company Brand Partner in that country. Any violation of this rule constitutes a material breach of this contract and is grounds for immediate termination of the Brand Partner position.

**9.23 Product/Services Claims.** Brand Partner shall make no claim, representation or warranty concerning any product or service of the Company, except for those contained in the official Company materials. Brand Partner can only promote benefits of Nerium products using language contained in the official Company materials. **Brand Partners may not make any medical, therapeutic, curative or treatment claims regarding any Nerium product. Brand Partners may only use "Before" and "After" photos provided by the Company. The use of any unauthorized "Before" and "After" photos is prohibited.**

**9.24 Promotional Items.** All promotional items that bear the Company name or logo shall be purchased solely from the Company or its approved supplier unless prior written permission is obtained from the Company.

**9.25 Telemarketing.** Telemarketing is strictly prohibited. The Federal Trade Commision and Federal Communications Commission each have laws that restrict telemarketing practices. Both federal agencies (as well as a number of states) have "do not call" regulations as part of their telemarketing laws. Although the Company does not consider Brand Partners to be "telemarketers" in the traditional sense of the word, these government regulations broadly define the term "telemarketer" and "telemarketing" so that your inadvertent action of calling someone whose telephone number is listed on the federal "Do Not Call" registry could cause you to violate the law. Moreover, these regulations must not be taken lightly, as they carry significant penalties.

a) Therefore, Brand Partners must not engage in telemarketing in the operation of their Company businesses. The term "telemarketing" means the placing of one or more telephone calls to an individual or entity to induce the purchase of a Company product or service or to recruit them for the Company opportunity. "Cold calls" made to prospective customers or Brand Partners that promote either Company products or services or the Company opportunity constitute telemarketing and are prohibited. However, a telephone call placed to a prospective customer or Brand Partner (a "prospect") is permissible under the following situations:

b) You may call family members, personal friends and acquaintances. An "acquaintance" is someone with whom you have at least a recent first-hand relationship within the preceding three (3) months. Bear in mind, however, that if you make a habit of "card collecting" with everyone you meet and subsequently call them, the FTC may consider this a form of telemarketing that is not subject to this exemption. Thus, if you engage in calling "acquaintances," you must make such calls on an occasional basis only and not make this a routine practice;

c) The prospect's personal inquiry or application regarding a product or service offered by the Brand Partner happens within the three (3) months immediately preceding the date of such a meeting;

d) If the Brand Partner has an established business relationship with the prospect. An "established business relationship" is a relationship between a Brand Partner and a prospect based on the prospect's purchase, rental or lease of goods or services from the Brand Partner or a financial transaction between the prospect and the Brand Partner within the eighteen (18) months immediately preceding the date of a telephone call to induce the prospect's purchase of a product or service; and

e) If the Brand Partner receives written and signed permission from the prospect authorizing the Brand Partner to call. The authorization must specify the telephone number(s) which the Brand Partner is authorized to call.

f) In addition, Brand Partners shall not use automatic telephone dialing systems relative to the operation of their Company businesses. The term "automatic telephone dialing system" means equipment which has the capacity to (a) store or produce telephone numbers to be called, using a random or sequential number generator, and (b) to dial such numbers

## SECTION TEN: RETAIL CUSTOMER RETURNS

**10.01 Retail Customer Guarantee.** The Company offers a 100% money-back satisfaction guarantee to all retail customers within thirty (30) days of purchase. If a retail customer is dissatisfied with any of the Company products for any reason, then that retail customer may return that product in its original package and shipping containers, with original proof of purchase, to the original selling Brand Partner for either a replacement or a full refund of the purchase price minus shipping. Customer is responsible for cost of return freight.

**10.02 Warranties.** Except as expressly stated herein, the Company makes no warranty or representation as to the merchantability, fitness for a particular purpose, workmanship or any other warranty concerning any product or service purchased from or through the Company. The manufacturer's warranty will be transferred to Brand Partner.

**10.03 Buyer's Right to Cancel.** Federal law grants a buyer the right to cancel certain sales without penalty prior to midnight of the third business day after the transaction. This rule covers retail consumer sales of $25.00 or more that occur away from the seller's main office. The Company sales order form contains all legally required notices. Two copies shall be given to the buyer by Brand Partner on every sale. In addition, the Brand Partner shall orally inform the buyer of the three-day right to cancel at the time the buyer purchases the goods.

**10.04 Retail Customer Refunds.** The Company will replace the returned retail product to the Brand Partner provided the following procedures and conditions are met:

    a) The product shall be returned to the Company by the Brand Partner who purchased it from the Company within sixty (60) days of the date of the original purchase;

    b) Brand Partner shall obtain a return authorization number from the Company customer service department within ten (10) days of the return date to Brand Partner and prior to returning any product; and

    c) The product shall be received by the Company within twenty (20) days of the return date to Brand Partner.

    d) The return shall be accompanied by the following:

        1.) A signed statement from the retail customer identifying the reason for the return;

        2.) A copy of the original retail sales receipt;

        3.) The unused portion of the product is returned in its original container; and

        4.) The name, address and telephone number of the retail customer.

    e) A signed statement from the retail customer identifying the reason for the return;

    f) A copy of the original retail sales receipt;

    g) The unused portion of the product is returned in its original container; and

    h) The name, address and telephone number of the retail customer.

    i) Proper shipping carton(s) and packing materials shall be used in packaging the product(s) being returned for replacement, and the best and most economical means of shipping is suggested.

    j) The Brand Partner will pay the cost of shipping replacement product(s).

    k) The Company will replace the product, but will not refund to any Brand Partner the purchase price of any retail customer returns.

**APPENDIX B**

19 of 30　　©2015 Nerium International™, LLC.　4006 Belt Line Road #100　Addison, TX 75001　Tel: 855-463-7486　Fax to: 214-390-9988　neriumsupport.　　reserved. R0515

**10.05 Quality Control.** The Company will replace, within twelve (12) months of purchase, any product found to be defective; however, no product shall be returned to the Company without prior written approval. Exchanges only. No Refunds.

a) A written replacement request shall be submitted stating the reason for the request and accompanied by a copy of the Purchase Order Form or packing slip. Product returned without prior authorization will not be accepted.

b) The Company will provide the Brand Partner with a return authorization number and will instruct Brand Partner where to ship the product for inventory verification. Upon receipt and verification of the product, the Company will ship out replacement product as appropriate.

c) The Company will not replace any product previously certified by Brand Partner as sold under the 70% Rule, sold at a special discount or sold as a promotional item.

**10.06 Termination Returns.**

a) A Brand Partner who terminates Brand Partner's business relationship with the Company has the right to return for repurchase on commercially reasonable terms currently marketable inventory including Company-produced promotional materials, sales tools and kits in possession of Brand Partner and purchased by Brand Partner for resale prior to the date of termination. For purposes hereof, "reasonable commercial terms" shall mean the repurchase of marketable inventory within twelve (12) months from the Brand Partner's date of purchase at not less than 90% of the Brand Partner's original net cost less appropriate set-offs and legal claims, if any. In addition, for purposes of this section, products shall not be considered "currently marketable" if returned for repurchase after the products commercially reasonable usable or shelf life period has passed (shelf life will be deemed to have passed if the product package has been opened); nor shall products be considered "currently marketable" if the Company clearly discloses to the Brand Partner prior to purchase that the products are seasonal, discontinued or special promotional products and are not subject to the repurchase obligation. The Company will not issue a refund nor replace any product previously certified as having been sold under the 70% Rule. No refunds will be issued unless a Brand Partner is in strict compliance with the procedures contained herein:

b) A written return request shall be submitted, stating the reason for the termination, the reason for the return of product and/or sales materials, and accompanied by original proof of payment and a copy of the Purchase Order Form or Packing Slip. Product returned without prior authorization will be returned to Brand Partner;

c) The Company will provide Brand Partner with a return authorization number, and will instruct Brand Partner where to ship the product for inventory verification. Upon receipt and inspection of the return, Company will process the appropriate refund for payment; and

d) Brand Partner shall pay the cost of return freight.

e) All commissions, overrides and bonuses paid to a terminated Brand Partner as a result of any product returned upon termination shall be repaid to the Company. The Company may deduct such amounts from any commissions or other amounts owed to such Brand Partner. All commissions, overrides and/or bonuses paid to a Brand Partner's upline on a returned product shall be repaid to the Company by the upline Brand Partner.

**APPENDIX B**

**Page 63**

©2015 Nerium International™, LLC.   4006 Belt Line Road #100   Addison, TX 75001   Tel: 855-463-7486   Fax to: 214-390-9988   neriumsupport.   All Rights Reserved. R0515

**11.01 Indemnity Agreement.** Brand Partner agrees to indemnify and hold harmless the Company, its shareholders, officers, directors, employees, agents and successors in interest from and against any claim, demand, liability, loss, cost or expense including, but not limited to, court costs and attorneys' fees, asserted against or suffered or incurred by any of them, directly or indirectly, arising out of or in any way related to or connected with allegedly or otherwise, that Brand Partner's (a) activities as Brand Partner; (b) breach of the terms of the Agreement; and/or (c) violation of or failure to comply with any applicable federal, state or local law or regulation.

**11.02 Other Services and Products.** No products or services, except for the Company's products or services, shall be sold or shown at any event where the Company's product or services are sold or shown. Except as provided above, a Brand Partner is not restricted from selling other companies' services and products that are not similar to or competitive with the products and services of the Company. However, promotion of direct sales and/or network marketing programs and/or competitive services or products with anyone are strictly prohibited.

**11.03 Limit on Liability.** To the extent permitted by law, the Company shall not be liable for and Brand Partner releases the Company from and waives all claims for any loss of profits, indirect, direct, special or consequential damages or any other loss incurred or suffered by Brand Partner as a result of (a) the breach by Brand Partner of the Agreement and/or the terms and conditions of the Policy Manual; (b) the operation of Brand Partner's business; (c) any incorrect or wrong data or information provided by Brand Partner; (d) any copyright violation in connection with materials provided by Brand Partner; or (e) the failure to provide any information or data necessary for the Company to operate its business, including, without limitation, the enrollment and acceptance of Brand Partner into the Compensation Plan or the payment of commissions and bonuses.

**11.04 Limitation of Damages.** To the extent permitted by law, the company and its affiliates, officers, directors, employees and other representatives shall not be liable for and Brand Partner hereby releases the foregoing from and waive any claim for loss of profit, incidental, special, consequential or exemplary damages which may arise out of any claim whatsoever relating to the company's performance, non performance, act or omission with respect to the business relationship or other matters between any brand partner and the company, whether sounding in contract, tort or strict liability. Furthermore, it is agreed that any damages to Brand Partner shall not exceed and is hereby expressly limited to, the amount of unsold Company programs, services and/or products of the Company owned by Brand Partner and any commissions owed to Brand Partner.

**11.05 Record Keeping.** The Company encourages Brand Partner to keep complete and accurate records of all Brand Partner's business dealings.

**11.06 Non-Solicitation and Non-Competition.** Brand Partner acknowledges and agrees that the only way to protect the goodwill, confidential, proprietary and trade secret information of Company and the integrity and stability of the sales force created by other Brand Partners is to prohibit all Brand Partners from recruiting and soliciting of other Brand Partners to other companies during the term of this agreement and for a reasonable time thereafter. Consequently, in consideration for all of the rights granted by this Agreement, including the protection this non-solicitation provision affords to Brand Partner, for the term of this Agreement and for two (2) years after termination hereof, for any reason, Brand Partner agrees not to, directly or indirectly, recruit or solicit any of Company's other Brand Partners to join other direct sales, multi-level or network marketing companies.

For the term of this Agreement and for two (2) years after termination hereof, for any reason, Brand Partner agrees not to sell any product that is the same or similar to or competes with the products of Company within the United States of America or any other country where Company sells its products.

Brand Partner agrees not to solicit, directly or indirectly, Company's Brand Partners to purchase services or products, except those of Company, throughout the term of this Agreement.

**11.07 Amendments.** The Company reserves the right to amend the Agreement, Policy Manual, its retail prices, product availability and the Compensation Plan at any time without prior notice as it deems appropriate. Amendments will be communicated to Brand Partner through official Nerium publications, by posting on the Nerium website or voice and/or e-mail. Amendments are effective and binding on Brand Partner and Nerium thirty (30) days after notice. All amendments are prospective and do not apply to incidents, occurrences or proceedings occurring before the effective date of the amendment. In the event any conflict between the original documents or policies and any such amendment, the amendment will control.

**APPENDIX B**

**Page 64**

**11.08 Non-Waiver Provision.** No failure of the Company to exercise any power under the Policy Manual or to insist upon strict compliance by Brand Partner with any obligation or provision herein, and no custom or practice of the parties at variance with this Policy Manual, shall constitute a waiver of the Company's right to demand exact compliance with this Policy Manual. The Company's waiver of any particular default by Brand Partner shall not affect or impair the Company's rights with respect to any subsequent default, nor shall it affect any way in the rights or obligations of any other Brand Partner. Nor shall any delay or omissions by the Company to exercise any right arising from a default affect or impair the Company's rights as to that or any subsequent default. Waiver by the Company can be affected only in writing by an authorized officer of the Company.

**11.09 Arbitration.**

a) Except as expressly set forth herein, all disputes, claims or causes of action relating to or arising from any Independent Brand Partner Application, Nerium International Terms of Agreement, Company's Policies and Procedures, and any other Company policies, products and services, the rights and obligations of Company and Brand Partner or any other disputes, claims or causes of action between Brand Partner and any of its officers, directors, employees or affiliates and Company or any of its officers, directors, employees or affiliates whether in tort or contract, shall be settled totally and finally by arbitration in Dallas, Texas, in accordance with the Commercial Arbitration Rules of the American Arbitration Association, including the optional rules for emergency measures of protection which Company may use, in addition to or instead of the procedures set forth in section (c) below. The arbitration shall be conducted before a single arbitrator and shall not be conducted on a class-wide, class action or multiple complaining-party basis.

b) Notwithstanding the foregoing, the arbitrator shall have no jurisdiction over disputes relating to the ownership, validity or registration of any mark or other intellectual property or proprietary or confidential information of the Company without the Company's prior written consent. The Company may seek any applicable remedy in any applicable forum with respect to these disputes and with respect to money owing to the Company. In addition to monetary damages, the Company may obtain injunctive relief against Brand Partner for any violation of the Agreement or misuse of the Company's trademark, copyright or confidential information policies.

c) Nothing in this rule shall prevent the Company from applying to and obtaining from any court having jurisdiction a writ of attachment, a temporary injunction, preliminary injunction and/or other injunctive or emergency relief available to safeguard and protect the Company's interests prior to the filing of or during or following any arbitration or other proceeding or pending the handing down of a decision or award in connection with any arbitration or other proceeding. Brand Partner hereby agrees that violation of the prohibition on use or disclosure of trade secrets, proprietary or confidential information or the prohibition of the non-solicitation and non-disparagement provisions herein stated will cause Company irreparable injury for which there is no adequate remedy at law and hereby agrees to the entry of an exparte temporary restraining order, preliminary and permanent injunction or any other emergency remedy necessary to prevent said violation.

d) Nothing contained herein shall be deemed to give the arbitrator any authority, power or right to alter, change, amend, modify, add to or to subtract from any of the provisions of this Agreement.

**11.10 Entire Agreement.** This Policy Manual is incorporated into the Agreement, along with the Compensation Plan, and constitutes the entire agreement of the parties regarding their business relationship.

**11.11 Governing Law, Jurisdiction and Venue.** The Agreement, including this Policy Manual, shall be governed by the laws of the State of Texas, except that any conflict-of-law rule that may require reference to the laws of some other jurisdiction shall be disregarded. The parties further agree that, subject to and without waiver of the requirements of the agreement to arbitrate contained in paragraph 11.09 above, the state and federal courts located in Dallas County, Texas shall be the exclusive forum for litigation of any dispute between or among Brand Partner and any of its officers, directors, employees or affiliates and Company or any of its officers, directors, employees or affiliates, that is permitted to be litigated in court under paragraph 11.09. The parties irrevocably waive any right any of them may have to assert that venue or jurisdiction for any such litigation should lie elsewhere, including, but not limited to, any objection based on forum non conveniens or personal jurisdiction. The parties intend this provision to be a binding, mandatory and exclusive forum-selection clause, subject to and without waiver of the agreement to arbitrate.

**11.12 Force Majeure.** The Company shall not be responsible for delays or failure in performance caused by circumstances beyond a party's control, such as strikes, labor difficulties, fire, war, government decrees or orders or curtailment of a party's usual source of supply.

**APPENDIX B**

**Page 65**

©2015 Nerium International™, LLC.   4006 Belt Line Road #100   Addison, TX 75001   Tel: 855-463-7486   Fax to: 214-390-9988   neriumsupport.   ...  ...served. R0515

**11.13 Notice.** Any communication, notice or demand of any kind whatsoever, which either Brand Partner or the Company may be required or may desire to give or to serve upon the other shall be in writing and delivered by electronic communication whether by telex, telegram, e-mail or fax (if confirmed in writing sent by registered or certified mail, postage pre-paid, return receipt requested or by personal service). Any party may change its address for notice by giving written notice to the other in the manner provided in this Section. Any such communication, notice or demand shall be deemed to have been given or served on the date personally served by personal service, on the date of confirmed dispatch if by electronic communication, or on the date shown on the return receipt or other evidence if delivery is by mail.

**11.14 Severability.** If under any applicable and binding law or rule of any applicable jurisdiction, any provision of the Agreement, including this Policy Manual, or any specification, standard or operating procedure which the Company has prescribed, is held to be invalid or unenforceable, the Company shall have the right to modify the invalid or unenforceable provision, specification, standard or operating procedure or any portion thereof, to the extent required to be valid and enforceable, and Brand Partner shall be bound by any such modification. The modification will be effective only in the jurisdiction in which it is required.

**11.15 Violations.** It is the obligation of every Brand Partner to abide by and maintain the integrity of this Policy Manual. If Brand Partner observes another Brand Partner committing a violation, such Brand Partner should discuss the violation directly with the violating Brand Partner. Any violations reported to the Company shall follow the Company's reporting procedures and may be reported by phone to Nerium International Support Department at 855-4-NERIUM (855-463-7486).

**APPENDIX B**

**Page 66**

©2015 Nerium International™, LLC.    4006 Belt Line Road #100   Addison, TX 75001   Tel: 855-463-7486   Fax to: 214-390-9988   neriumsupport.~~~~~~rved. R0515

## SECTION TWELVE: CODE OF PROFESSIONAL ETHICS

Nerium international, LLC., believes that its Brand Partners should subscribe to the principles of fairness, honesty, integrity and service. The relationship of the company to Brand Partner, Brand Partner to customer and Brand Partner to others should be preserved, protected and promoted in accordance with the highest standards of conduct. Therefore, Brand Partner agrees to abide by and subscribe to the code of professional ethics (the "code of ethics") contained in this section twelve.

AS A BRAND PARTNER, I AGREE THAT:

**12.01**  I will be honest and fair in all my dealings while acting as a Brand Partner of the Company.

**12.02**  I will respect the time and privacy of the people I contact to become retail customers or Brand Partners of the Company. I will be courteous and respectful to every person contacted in the course of my Company business.

**12.03**  I will perform all my professional activities in a manner that will enhance my reputation and the reputation of the Company.

**12.04**  I will fulfill my leadership responsibilities as a Sponsor, including training and otherwise supporting Brand Partners in my sales organization.

**12.05**  I will not engage in any deceptive or illegal practice, or any practice prohibited by the Agreement or the Policy Manual.

**12.06**  I will not make diagnostic, therapeutic or curative claims for the Company's products. I will not make any claims not contained in official Company literature. I will represent only that "each body is unique and responds uniquely to different products," remembering that even my personal experience with the product may be interpreted as an "extension of labeling claims" if I use those experiences as a sales device.

**12.07**  I will make no income claims or representations regarding the Company Compensation Plan, remembering that ideal projections of the Company Compensation Plan are unrealistic. No network is grown in a perfect geometric progression and therefore it is impossible to predict incomes. Further, a Brand Partner's success depends on many variables, such as the amount of time committed to his/her business and the degree of organizational ability.

**12.08**  I understand and agree that I am solely responsible for all financial and/or legal obligations incurred by me in the course of my business as a Brand Partner of Nerium International, including self-employment taxes, income taxes, sales taxes, license fees and related personal fees.

**12.09**  I will always honor the Company's 100% satisfaction, thirty (30) day money back guarantee when dealing with my retail customers.

**12.10**  I understand and agree that capitalism is one of the most competitive economic systems in the world; I will compete aggressively but fairly, and I will respect the professionals of other network marketing companies. I will not solicit from the proprietary rolls or "genealogical" printouts of other network marketing companies. I will not use sales materials or professional associations that may be regarded as proprietary by other companies. The Company seeks to promote the reputation of all reputable network marketing companies that are furthering the cause of personal independence for their Brand Partners.

**12.11**  A Brand Partner shall engage in no conduct which negatively impacts, disrupts or impairs the reputation or business of the Company or other Brand Partners, including, but not limited to: disparagement of the Company, its Officers or Employees or other Brand Partners; manipulation of the Compensation Plan; undermines or is at odds with the training systems utilized by and authorized by the Company; conduct which is abusive, disrespectful or intimidating of other Brand Partners, Customers, Employees or Affiliates of the company; conduct that undermines the relationship between the Company and Brand Partners or relationships between Brand Partners; conduct which is false, fraudulent, dishonest or deceptive in any way; or any other conduct which the Company deems disreputable or, in anyway, negatively impacts the Company or other Brand Partners.

**APPENDIX B**

**Page 67**

©2015 Nerium International™, LLC.   4006 Belt Line Road #100   Addison, TX 75001   Tel: 855-463-7486   Fax to: 214-390-9988   neriumsupport.   All rights reserved. R0515

**13.01 Distributor Agreement for Georgia.** This addendum is applicable to Georgia participants only.

a) This addendum shall supersede and override any provisions in the independent distributor agreement which shall be in conflict with this addendum, except that any cancellation or buy-back provision in the distributor agreement, which is more favorable in terms to the distributor than this addendum, shall remain in full force and effect. The further purpose of this addendum is to set forth the rights of the independent distributor.

b) Description of Products or Services: The company markets skincare and health-oriented products and services to the consumer through independent distributors by way of network marketing. The company's product line is indicated on the enclosed brochures. The company's primary service to distributors who are independent contractor marketers is to make available quality products for distributors to sell. In addition, the company makes available sales and marketing literature, ordering and other forms, supportive materials to promote the business and policies and procedures to provide guidance in conduct of the business. The company maintains a distributor relations department to answer questions of distributors. The company makes available to distributors downline sales organization data processing reports to inform distributors of sales production activity of their sales organization. Information regarding shipping and training are provided in other paragraphs. The company's sales and marketing materials provide more detailed information. The company supplies marketing materials and fulfills orders of its distributors.

c) Delivery Date of Products: After receipt of orders and payment in full, the company ships orders for its products received before 12:00 p.m. CST the same day, and orders received after 12:00 p.m. CST are shipped the next business day. Product orders are sent via Federal Express. Methods of payment include check or credit cards.

d) Training: The Company offers a complete library of print and video materials to all independent distributors at no charge. The materials are readily available over the internet in the distributor's personal virtual office. The training materials cover the science behind the product, how to conduct a personal sales party in the home, an understanding of the Compensation Plan and a complete library of personal development tools.

e) A participant in this multilevel marketing plan has a right to cancel at any time, regardless of reason. Cancellation must be submitted in writing to the company at its principal business address.

f) Cancellation and Buy-Back Policy: The company will honor minimum cancellation rights to the participant in accordance with OCGA § 10-1-415(d)(1), (2) and (3), which code sections provide as follows and are set forth verbatim:

1.) "If the participant has purchased products or paid for administrative services while the contract of participation was in effect, the seller shall repurchase all unencumbered products, sales aids, literature, and promotional items which are in a reasonably resalable or reusable condition and which were acquired by the participant from the seller; such repurchase shall be at a price not less than 90 percent of the original net cost to the participant of the goods being returned. For purposes of this paragraph, 'original net cost' means the amount actually paid by the participant for the goods, less any consideration received by the participant for purchase of the goods which is attributable to the specific goods now being returned. Goods shall be deemed 'resalable or reusable' if the goods are in an unused, commercially resalable condition at the time the goods are returned to the seller. Goods which are no longer marketed by the company shall be deemed 'resalable or reusable' if the goods are in an unused, commercially resalable condition and are returned to the seller within one year from the date the company discontinued marketing the goods; provided, however, that goods which are no longer marketed by a multilevel distribution company shall not be deemed 'resalable or reusable' if the goods are sold to participants as nonreturnable, discontinued, or seasonal items and the nonreturnable, discontinued, or seasonal nature of the goods was clearly disclosed to the participant seeking to return the goods prior to the purchase of the goods by the participant. Notwithstanding anything to the contrary contained in this paragraph, a multilevel distribution company may not assert that any more than 15 percent of its total yearly sales per calendar year to participants in dollars are from nonreturnable, discontinued, or seasonal items;

2.) The repayment of all administrative fees or consideration paid for other services shall be at not less than 90 percent of the costs to the participant of such fees or services and shall reflect all other administrative services that have not, at the time of termination, been provided to the participant; and

**APPENDIX B**

3.) The participant may be held responsible for all shipping expenses incurred in returning sales aids or products to the company but only if such responsibility of a canceling participant is disclosed in the written description of the cancellation rights." The cancellation and buy-back policy above is controlling and overrides any contrary language in any other company materials.

g) Pursuant to OCGA § 10-1-415(d)(3), notice is given that the participant shall be responsible for all shipping expenses incurred in returning sales aids or products to the company.

**13.02 Distrubutor Agreement for Louisiana.** This addendum is applicable to Louisiana participants only.

a) This addendum shall supersede and override any provisions in the independent distributor agreement which shall be in conflict with this addendum, except that any cancellation or buy-back provision in the distributor agreement, which is more favorable in terms to the distributor than this addendum, shall remain in full force and effect. The further purpose of this addendum is to set forth the rights of the independent distributor.

b) A participant in this multilevel marketing plan has a right to cancel at any time, regardless of reason. Cancellation must be submitted in writing to the Company at its principal business address.

c) No purchase or investment is necessary to become a Company distributor other than the purchase of a distributor sales kit which is sold "at Company cost."

d) Waiver of Personal Activity Requirement During First Sixth Months. During the first six (6) months after commencement of the distributor agreement, every Louisiana distributor is excused from personal product purchase activity requirements to the extent that payment for product purchased when combined with any other consideration (e.g. sales kit) exceeds $300. During this period, no total payment in excess of $300, either by express condition or practical necessity may be required to qualify as an active distributor or to qualify for bonuses. The waiver of qualifying purchase requirements is controlling and overrides anything to the contrary in other Company materials. Other than purchase of sales kit, all purchases by a distributor are voluntary and are neither required by actual or practical necessity to participate fully in the marketing program.

e) Prohibition: Any payment by a distributor during his or her first 180 days in excess of $300 which may be considered under La. R.S. 51:1821(2) as initial consideration required by express condition or practical necessity is strictly prohibited.

1.) The above prohibition shall not in any way restrict the amount of retail sales.

2.) Upon termination, if the independent distributor has purchased products for inventory purposes or mandatory sales tools while the distributor agreement was in effect, all unencumbered products purchased within the previous twelve (12) months which are in an unused and commercially resalable condition then in possession of the independent distributor shall be repurchased. The repurchase shall be at price of not less than ninety (90%) percent of the original net cost to the participant returning such goods, taking into account any sales made by or through such participant prior to notification to the Company of the election to cancel. You may not re-join the Company for a period of six (6) months after a resignation.

3.) Louisiana Law Applicable. In the event of a dispute for jurisdictional purposes, a distributor shall be entitled to file an adjudicatory claim or lawsuit in the jurisdiction of Louisiana and the governing law shall be Louisiana law.

**13.03 Montana Addendum to Agreement.**

a) Refund Policy for Montana Representatives. The following refund policies shall be applicable to Montana representatives and shall supercede any policies that are less protective to Montana representatives.

1.) A representative may cancel participation in the representative contract for any reason at any time upon notification in writing to the company of the election to cancel.

2.) If the representative cancels participation and returns any required items, the person is entitled to a refund of any consideration given to participate in the sales plan or operation.

3.) Upon the request of a representative deciding to terminate participation in the sales plan or operation, there shall be the purchase, at not less than ninety percent (90%) of the amount paid by the representative, of any currently marketable goods or services sold to the representative within twelve (12) months of the request that have not been resold or consumed by the representative. **APPENDIX B**

©2015 Nerium International™, LLC.   4006 Belt Line Road #100   Addison, TX 75001   Tel: 855-463-7486   Fax to: 214-390-9988   neriumsupport.  R0515

4.) Within fifteen (15) days from the date of enrollment, a Montana resident may cancel his or her Agreement and may return his or her starter kit for a full refund within such time period.

**13.04 Distributor Agreement for Oklahoma.** This addendum is applicable to Oklahoma only.

a) The independent distributor agreement may be canceled at any time and for any reason by a distributor notifying the company and the sponsoring distributor in writing of the election to cancel.

b) If a distributor elects not to renew his or her distributor agreement, all rights to bonuses, marketing position and wholesale purchases cease. The terminated distributor's sales organization shall be transferred to his or her sponsor.

c) If the independent distributor has purchased products for inventory purposes or mandatory sales tools while the distributor agreement was in effect, all unencumbered products in a resalable condition then in possession of the independent distributor, which have been purchased within twelve (12) months of cancellation, shall be repurchased. The repurchase shall be at a price of not less ninety percent than ninety (90%) of the original net cost to the participant returning such goods, taking into account any sales made by or through such participant prior to notification to the Company of the election to cancel.

d) Any product purchases which have been previously represented by the terminating distributor as having been either resold or utilized for personal or family use under the company's 70% Rule or otherwise, are not subject to repurchase.

**13.05 Distributor Agreement for Texas.** This addendum is applicable to Texas distributors only.

a) The independent distributor agreement may be canceled at any time and for any reason by a distributor notifying the company and the sponsoring distributor in writing of the election to cancel.

b) If a distributor elects not to renew his or her distributor agreement, all rights to bonuses, marketing position and wholesale purchases cease. The terminated distributor's sales organization shall be transferred to his or her sponsor.

c) If the independent distributor has purchased products for inventory purposes or mandatory sales tools while the distributor agreement was in effect, all unencumbered products in a resalable condition then in possession of the independent distributor, which have been purchased within twelve months of cancellation, shall be repurchased. The repurchase shall be at a price of not less than ninety percent (90%) of the original net cost to the participant returning such goods, taking into account any sales made by or such participant through prior to notification to the Company of the election to cancel.

d) Any product purchases which have been previously represented by the terminating distributor as having been either resold or utilized for personal or family use under the company's 70% Rule or otherwise, are not subject to repurchase.

**13.06 Wyoming Addendum to Agreement.**

a) Refund Policy for Wyoming Distributors. The following refund policies shall be applicable to Wyoming distributors and shall control over any policies that are less protective to Wyoming distributors.

1.) A distributor may cancel participation in the distributor contract for any reason at any time upon notification in writing to the company of the election to cancel.

2.) If the participant has purchased products while the contract of participation was in effect, all unencumbered products in a resalable condition then in the possession of the participant shall be repurchased by the company. The repurchase shall not be at a price of not less than ninety percent (90%) of the original net cost to the participant returning such goods, taking into account any sales made by or through such participant prior to notification to the company of the election to cancel.

3.) Although the company does not have a purchase requirement, in the event such a requirement is made of participants in its marketing program to purchase products or services or pay any other consideration in order to participate in the marketing program, the following refund policy shall be applicable and the company agrees:

a.) To repurchase all or part of any products which are unencumbered and in a resalable condition at a price of not less ninety percent (90%) of the original net cost to the participant, taking into account any sales made by or through such participant prior to notification to the company of election to cancel;

**APPENDIX B**

**Page 70**

©2015 Nerium International™, LLC.   4006 Belt Line Road #100   Addison, TX 75001   Tel: 855-463-7486   Fax to: 214-390-9988   neriumsupport.   ght  served. R0515

b.) To repay not less than ninety percent (90%) of the original net cost of any services purchased by the participants; or

c.) To refund not less than ninety percent (90%) of any other consideration paid by the participant in order to participate in the marketing program.

**APPENDIX B**

**Page 71**

 ©2015 Nerium International™, LLC.   4006 Belt Line Road #100   Addison, TX 75001   Tel: 855-463-7486   Fax to: 214-390-9988   neriumsupport.com   All Rights Reserved. R0515